# CHARLESTON.

The Weaver Mercantile Co. v. Thurmond.

Submitted March 23, 1909. Decided January 24, 1911.

1. Negligence—*Use of Premises.*
    A man is bound to use his premises so as not to injure his neighbor's property.

2. Waters and Water Courses—*Artificial Reservoir—Liability for Injury to Adjoining Owner.*
    A land owner who brings water upon his premises by arti-ficial means, and stores it in tanks or reservoirs for his use, is liable if the water escape and injure the property of an adjoining owner.

3.  SAME.

    If a landlord have on his premises a water tank which supplies water to several houses occupied by several tenants, he is bound at his peril to prevent the water from escaping and injuring the property of an adjoining proprietor.

4.  SAME—*Negligence—Presumption—Res Ipsa Loquitur.*

    If the tank bursts and the escaping water does injury to the property of an adjoining proprietor, negligence will be presumed. In such case the rule of *res ipsa loquitur* applies.

5.  BANKRUPTCY—*Action by Bankrupt—Intervention by Trustee.*

    A trustee in bankruptcy may obtain permission from the bankrupt court to intervene and prosecute a suit brought in the state court by the bankrupt before his adjudication. But his failure to intervene will not abate the suit.

6.  SAME.

    If the trustee fail to intervene in such suit in the lower court he can not do so by petition in this Court after the case has been brought here on writ of error or appeal. Such petition presents original matter which does not belong to the jurisdiction of this Court.

   Error to Circuit Court, Fayette County.

    Action by the Weaver Mercantile Company against W. D. Thurmond. Judgment for plaintiff, and defendant brings error.

                                *Affirmed.*

 *Dillon & Nuckolls,* for plaintiff in error.

 *Osenton, McPeak & Horan,* for defendant in error.

WILLIAMS, PRESIDENT:

    Action of trespass in circuit court of Fayette county for injury to personal property, judgment for plaintiff for $650, and defendant brings error.

    Defendant was the owner of an hotel situate at the base of a hill in the town of Thurmond, Fayette county. It was supplied with water by means of a large wooden tank erected on the side of the hill some distance above the hotel. The plaintiff company did a mercantile business and occupied, as a store room, a building under lease from J. W. Mankin, situate below the water tank. The tank burst and the water flowed down the hill into the store room and damaged plaintiff's goods.

    A number of defenses are made to the action. The first is

that the tank was constructed of apparently good material, and in a workmanlike manner; and that, if there was, in fact, any defect in the material, or fault in construction such defect was latent, and defendant was ignorant of it and therefore not liable, because not negligent. But, as we understand the law to be, the liability of defendant does not depend on negligence in construction, but upon negligence in not keeping the water confined. No matter in what the negligence consisted, it is proved by the bursting of the tank. The rule, *res ipsa loquitur*, applies. If the person, whose duty it was to keep the tank in good repair, had not been negligent in some respect, the tank would not have burst. The negligent act may have been the failure to keep it properly painted, but it is not material what it was. Liability, in cases like the present, rests upon the principle that a man who erects a structure upon his premises which, because of neglect to take care of it, becomes a nuisance, either to the public or to the property of an adjoining owner, is liable. He is bound, at his peril, to prevent it from injuring the property of his neighbor. In 1 Wood on Nuisances, sec. 111, the rule is thus stated: "Every person who, for his own profit and advantage, brings upon his premises, and collects and keeps there any thing which, if it escapes, will do damage to another, subject to some exceptions rendered necessary for the protection of industrial interests, is liable for all the consequences of his acts, and is bound at his peril to confine it and keep it in upon his own premises. If he does not, he is answerable for all the damages that result therefrom, without any reference to the degree of care or skill exercised by him in reference thereto. Therefore, if a man brings water upon his premises by artificial means, and collects and keeps it there, either in reservoirs or in pipes, he is bound at his peril to see that the water does not escape, to the damage of an adjoining owner."

This principle has few exceptions, and has been applied in a large number of cases, both in England and in this country. A few of such cases will serve to illustrate the correctness of applying the principle in this case.

A cooking range, erected so near a partition wall of two adjoining houses as, by its ordinary use, to injure the goods of the adjoining proprietor and render his house uncomfortable and disagreeable, has been held to constitute a nuisance. *Grady*

v. *Wolsner,* 46 Ala. 381. Where the walls of a building, after the building has been partially destroyed by fire, were permitted to stand, and afterward fell upon a person passing along the street, it was held that the corporation owning the building was liable. *The Rector &c. of the Church of Ascension* v. *Buckhart,* (N. Y.) 3 Hill 193. A building adjoining the street fell, and injured a person passing, the owner of the building was held liable. *Mullen* v. *St. John,* 57 N. Y. 567. The court also held that, in the absence of explanatory circumstances, negligence of the owner was presumed, and that the burden is upon him to prove that he used ordinary care.

*Curney* v. *London &c. R. R. Co.,* 5 Q. B. 411, is a leading English case decided in 1870. In that case plaintiff was injured by a brick falling on him from the top of one of the pilasters of a railroad bridge, as he was passing along a highway underneath. Defendant moved for a nonsuit, on the ground that no negligence was shown, but the court of Queen's Bench, by a divided vote, held that it was a case in which the doctrine of *res ipsa loquitur* applied. This case was appealed to the Exchequer Chamber and was there unanimously affirmed, that court holding that the defendant was bound to use due care in keeping the bridge in proper repair, so as not to injure persons passing along the highway, and that there was evidence from which the jury might infer negligence. Negligence may be, and often is, inferable from the nature of the accident causing the injury as, for instance, from the falling of a barrel into the highway from the window of a shop, *Byrne* v. *Boudle,* 2 Hurl. & Colt 722; the falling of bags of sugar on plaintiff as he was passing by a warehouse. *Scott* v. *London Dock Co.,* 3 Id. 596. In the case of *Gee* v. *Railway Co.,* 8 Q. B. 161, plaintiff was injured by falling out of the door of a railroad coach. He had placed his hand on a brass rod across the door for the purpose of steadying himself in order to look out of the window. He supposed the door was closed and fastened, but as soon as he placed his hand on the rod the door swung open and he fell out and was injured. Upon this state of facts the court unanimously held that plaintiff had a right to assume that the door was closed and fastened, that he was not guilty of contributory negligence, and that the negligence of defendant in not having closed and fastened the door of the coach when plaintiff boarded

the train, which seems to be a rule of the railroads in England, could be properly inferred. /

In *Fletcher v. Rylands,* L. R. 1 Exchequer 265, which is a leading English case, the facts were: "The defendant had constructed a reservoir on lands separated from the plaintiff's colliery by intervening land; mines under the site of the reservoir and under part of the intervening land had been formerly worked, and the plaintiff had, by workings, lawfully made in his own colliery and in the intervening land, opened an underground communication between his own colliery and the old workings under the reservoir. It was not known to the defendants, nor to any person employed by them in the construction of the reservoir that such communication existed, or that there were any old workings under the site of the reservoir, and the defendants were not personally guilty of any negligence, but, in fact, the reservoir was constructed over five old shafts leading down to the workings. On the reservoir being filled the water burst down these shafts and flowed by the underground communication into the plaintiff's mines". Upon this state of facts the court of Exchequer Chamber held that the defendants were liable for the damage caused. The court in its opinion says: "We think that the true rule of law is, that the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. He can excuse himself by showing that the escape was owing to the plaintiff's default, or perhaps that the escape was the consequence of *vis major,* or the act of God; but as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient. The general rule, as above stated, seems on principle just. The person whose grass or corn is eaten down by the escaping cattle of his neighbour, or whose mine is flooded by the water from his neighbour's reservoir, or whose cellar is invaded by the filth of his neighbour's privy, or whose habitation is made unhealthy by the fumes and noisome vapours of his neighbour's alkali works, is damnified without any fault of his own; and it seems but reasonable and just that the neighbour, who has brought something on his own property which was not naturally there, harmless to others so long as it is confined to

his own property, but which he knows to be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property. But for his act in bringing it there no mischief could have accrued, and it seems but just that he should at his peril keep it there so that no mischief may accrue, or answer for the natural and anticipated consequences. And upon authority, this we think is established to be the law whether the things so brought be beasts, or water, or filth, or stenches." This case was appealed to the House of Lords and there affirmed. 3 L. R. H. L. 330.

This same rule was applied by the supreme court of Minnesota upon a similar state of facts. Defendant had excavated a tunnel upon his own land extending under the bed of a stream. The pressure of the water caused the roof of the tunnel to break and the water, rushing through the tunnel, undermined plaintiff's land. The court held that "the defendant was liable for the damage occasioned, without proof of negligence or unskillfulness on his part." *Cahill* v. *Eastman,* 18 Minn. 435, (10 Am. Rep. 184). The court cites a number of cases in support of its decision, among them the case of *Fletcher* v. *Ryland, supra.*

To suffer filthy water to percolate through the soil and to injure the cellar and well of an adjoining proprietor, the supreme court of Massachusetts, in *Ball* v. *Nye,* 99 Mass. 582 (97 Am. Dec. 56), held to be an act for which the defendant was liable, and further held that no other negligence need be shown than such as was necessarily inferred from the nature of the injury. That court also cites, with approval, the case of *Fletcher* v. *Ryland, supra.*

In *Shipley* v. *Fifty Associates,* 106 Mass. 199, a proprietor who built the roof of his house so that quantities of ice and snow collected thereon, and fell upon a traveler in the highway, was held liable. It was also held that no further proof of negligence than that inferred from the manner of the accident, was necessary. See also *Wilson* v. *New Bedford,* 108 Mass. 261; *Gilmore* v. *Driscol,* 122 *Id.* 202; *Gorham* v. *Gross,* 125 *Id.* 232, applying the same principle.

Defendant, in the present case, had leased the hotel to his son, J. S. Thurmond, who was in possession at the time of the injury

complained of, and it is contended that, as there was no agreement by the lessor to make repairs, he is not liable. But the undisputed evidence is that the tank supplied water not only to the leased premises, but also to other houses in the vicinity of the hotel owned by defendant, and that the servant who was engaged in running the engine that pumped water from the river into the tank was employed by defendant. This engineer testified that he went to see the tank whenever he wanted water in it; that he saw it at 7:30 o'clock on the morning that it burst; that he was on top of the tank; that he saw it also on the evening previous. Here it is shown that defendant's agent filled the tank with water which caused it to burst. The rule of law is that the principal is liable for the acts of his agent done within the scope of his authority and in the line of his employment. The effect, therefore, upon defendant's liability is the same as if he himself had been running the engine. Independent of this fact, however, there is a positive rule of law which, under the circumstances proven to exist in this case, makes defendant liable. The general rule of law is that, in the absence of express agreement, it is the duty of the tenant to make repairs of the leased premises. This rule is based on the principle that during the continuance of the lease the landlord has no right of entry. But the present case falls under a well recognized exception to this general rule. It is this. Where premises are leased in part to two or more tenants, with the right of each to use a certain part in common, the law obliges the landlord to keep such part in repair. This rule applies between landlord and tenant, and *a fortiori* to the public, or to the adjoining proprietor. *Readman* v. *Conway,* 126 Mass 374; *Looney* v. *McLean,* 129 Mass 33; *Inhabitants of Milford* v. *Holbrook,* 91 Mass. 17; *Elliott* v. *Pray et al.,* 10 Allen (Mass.) 378; *Sawyer* v. *McGillicuddy,* 81 Me. 318 (*3 L. R. A. 458; Trustees of Village of Canandaigua* v. *Foster,* 156 N. Y. 354; 2 McAdam on Lan. & Ten., p. 1732. In the present case the tank was not used exclusively for the hotel, but was used to supply other buildings with water on lands of defendant. So that, according to the principle decided in the foregoing cases, the tank being, at the time of the injury, used in common by the lessee of the hotel, and by the landlord, or by his other tenants, and it matters not which, the landlord was bound to keep it in such repair as to

prevent the escape of the water in such manner as to injure the property of an adjoining owner.

The theory is advanced, in brief of counsel for defendant, that the bursting of the tank was caused by a clandestine explosion of dynamite. But this is only a theory, and there is no evidence to support it, except the testimony of J. S. Thurmond who says that he was on the street when it burst; that he heard a loud report, like an explosion, and immediately looked toward the tank and saw the body of water which looked white at first. His opinion, formed from what he heard and saw there, and from the appearance of the broken staves in the tank, which he afterwards saw scattered over the ground, was that it had been blown up with dynamite. But the sudden bursting of the large iron bands, or hoops, would very likely make a loud report; and the bursting of the hoops at the bottom would also likely cause the staves to break, if the hoops near the top of the tank did not give way at the same time. The pressure of thirty thousand gallons of water against the bottom ends of the staves, with the hoops holding the upper ends together, would be sufficient to break the staves. There is evidence that the tank had been painted only once after it was put up; that the hoops were almost eaten in two with rust. There is also evidence, by a competent expert witness, that it is necessary to paint such tanks, at least once a year, to prevent the rust from destroying the iron hoops. It burst between nine and ten o'clock in the morning of March 28, 1906. There is no evidence that it was caused by an act of God, such as a severe and unusual windstorm; and the dynamite theory is so highly improbable that we are compelled to say that, as a question of law, proof of the bursting of the hoops was also proof of defendant's negligence.

It is assigned as error that defendant's special plea, No. 3, was improperly rejected. It alleges that, after the institution of the suit, plaintiff had been adjudged a bankrupt. Section 11c of the Bankrupt Act of 1898 is: "A trustee may, with the approval of the court, be permitted to prosecute as trustee any suit commenced by the bankrupt prior to the adjudication, with like force and effect as though it had been commenced by him." Pursuant to this provision, the trustee could have obtained permission of the bankrupt court to prosecute this suit; but there is no evidence that he had such permission, or that

he applied for it before the time the plea was tendered. It does not follow that his failure to intervene in the suit would abate the action. The bankrupt may still prosecute an action to final judgment, provided the trustee does not intervene, just as if no trustee had been appointed. *Hubbard* v. *Gould,* (N. H.) 64 Alt. 668. "An action by a bankrupt in a state court does not abate upon the adjudication in bankruptcy or appointment of a trustee, and, in the absence of an application by the trustee for substitution it may be prosecuted by the bankrupt." *Hahlo* v. *Cole,* 98 N. Y. 1049. "A trustee in bankruptcy may, but need not, intervene as plaintiff in a suit brought by the bankrupt before the adjudication in bankruptcy." *Griffin* v. *Insurance Co.,* (Ga.) 46 So. 870. It was further held in that case that, if no trustee is appointed or if the bankrupt court does not consider it of interest to the estate of the bankrupt to permit the trustee to prosecute such suit, the action is not thereby abated. See also 3 Cur. Law 468. The fact that plaintiff was adjudged a bankrupt, after this action had been brought, could not affect defendant's interest in the result of the suit. It has no bearing on the question of his liability, and is not a matter of defense to him. Plea No. 3 was, therefore, properly rejected.

It is assigned as error that the court improperly refused to permit witness for plaintiff, M. E. Callahan, to answer a certain question on cross-examination, relating to the amount of plaintiff's loss. Shortly after the bursting of the tank witness Callahan, who was vice-president of the plaintiff company, assisted in taking an inventory of the goods for the purpose of estimating the amount of the damages, which he stated to be over $1,700. After the bursting of the tank plaintiff rented another room, and moved its goods to it; and after the goods were moved, a fire occurred which destroyed the entire stock, including the portion of the goods damaged by the water from the tank, which had not then been sold. On cross-examination he was asked: "Q. What became of these goods? A. We removed, afterwards, a part of them—a part of them were sold and the rest was removed to the store on the hill. Q. Do you know what you got for the ones which you sold?" To this last question the court sustained an objection, and the defendant excepted. This witness, notwithstanding he was interested

as an officer and stockholder in plaintiff company, was not personally employed in selling the goods. It is not shown that he knew what the goods brought, which had been sold. Witness had assisted in estimating the damage to the goods by the water, and was examined in chief to prove the amount estimated. The question objected to did not pertain to matters concerning which he had testified in his direct examination. Weaver, Graves, Buster and this witness were all engaged in estimating the damage to the goods. Weaver knew the cost price, and would call it out, and Graves and Buster would estimate the damage, and the figures were put down by witness Callahan. He was examined to prove that he had correctly taken down the figures as they were called out to him. It does not appear that there was a separate account kept of the damaged goods that were sold; so that, there was no way of estimating, by the accounts that were kept, what had been received for the portion of the damaged goods sold previous to the destruction, by fire, of what were not sold. It was, therefore, not error for the court to sustain plaintiff's objection to the question. But even if it were a proper question to be answered, it does not appear from the record what answer the witness was expected to make. Consequently, we are unable to see that defendant was prejudiced by the court's ruling.

Witness Graves, who assisted in making an estimate of the damages, was asked the following question: "Q. Tell the jury, Mr. Graves, how much the *damaged* footed up? How much it amounted to in dollars and cents?" The court overruled defendant's objection to this question. He excepted and assigns this action of the court as error. But the answer itself shows that he was not prejudiced by it. His answer was, "$1,300 and some cents. I do not know what it was. I did not make the figures." The jury were certainly capable of judging that this answer furnished no proof of the amount of damages. Witness says he didn't know because he didn't make the figures; and witness Callahan, who did take down the figures, was examined to supply the proof as to the amount of damage.

It was not error to refuse defendant's instruction No. 4. It is framed upon the theory that the defendant's liability rests alone upon the unsound condition of the tank, and the defendant's knowledge of such condition, at the time of the lease.

This is not the law, he was bound to know its condition and to keep it from doing injury to adjoining property owners.

Defendant's No. 6 was also properly refused. It would tell the jury that, if they believed it was the duty of J. S. Thurmond, the lessee, to keep the tank in repair, they must find for the defendant, unless it appear by a preponderance of the evidence that the tank was in an unsound, unsafe and dangerous condition at the time of the lease and that this fact was known to defendant, or could have been known by the exercise of ordinary diligence, and, furthermore, that the burden of proof is on plaintiff to show that it was in this unsound condition at the date of the lease. This is not the law of this case. The tank was a structure which, from its very nature, was likely to become dangerous by reason of neglect, and defendant was liable, notwithstanding his lessee may also have been liable.

Defendant's instructions Nos. 1, 3, and 5 are as favorable to him as we think the law warrants. No. 7 is, that the bursting of the tank does not, of itself, show negligence nor create liability on defendant. The cases which we have cited in the first part of this opinion are authority for holding that this is a case where the happening of the accident, of itself, is sufficient to establish negligence, there being no evidence that it was caused by an act of God, or that it was clandestinely destroyed by an enemy. It is a case in which the familiar rule of evidence, *res ipsa loquitur,* applies.

J. W. Crider, plaintiff's trustee in bankruptcy, presents a petition to this Court, praying that this cause be proceeded with in this Court for his benefit. The trustee was not made a party to the action below, and he cannot be made a party by order of this Court on petition. The petition presents matter for original jurisdiction, and can not be considered by this Court.

We find no error in the record, prejudicial to the defendant, and the judgment will be affirmed.

*Affirmed.*