Argued April 5; affirmed May 1, 1934

# STATE *v.* BANKS ET AL.
## (32 P. (2d) 571)

*Frank J. Lonergan,* of Portland, and *Charles A. Hardy,* of Eugene, for appellant.

*L. A. Liljeqvist,* Assistant Attorney-General, and *George A. Codding,* District Attorney, of Medford (I. H. Van Winkle, Attorney-General, Ralph E. Moody, Assistant Attorney-General, and G. W. Neilson, Deputy District Attorney, of Medford, on the brief), for the State.

BAILEY, J.   On March 24, 1933, the grand jury of Jackson county, Oregon, returned an indictment accusing Llewellyn A. Banks and Edith R. Banks of the crime of murder in the first degree and charging them with having on March 16, 1933, in Jackson county, Oregon, unlawfully, feloniously, purposely and of deliberate and premeditated malice, killed one George J. Prescott by then and there shooting the said Prescott with a rifle loaded with powder and bullets, said rifle being held in the hands of Llewellyn A. Banks at the time of the shooting.

Thereafter, on motion of the defendants for a change of venue, the place of trial was changed to Lane county, Oregon.  On May 21, 1933, the jury hearing the case returned a verdict of not guilty as to Edith R. Banks, and a verdict of guilty of murder in the second degree, against Llewellyn A. Banks.  On August 14, 1933, a judgment was entered against the latter defendant, sentencing him to life imprisonment in the state penitentiary, from which judgment he has appealed.

In so far as material on this appeal, the following are substantially the facts as shown by the record: Prior to March 16, 1933, considerable friction was prevalent at Medford, between the so-called "Good Government League" and the "Committee of One Hundred" both of which organizations had comparatively large memberships composed entirely, or practically so, of Jackson county residents.  The defendant Llewellyn A. Banks, hereinafter to be referred to as the defendant, was the publisher of a daily newspaper which became the organ of the Good Government League, of which the defendant was an active member and the honorary president.  Several civil suits and

criminal proceedings had been instituted and were pending against Banks when an indictment was returned by the Jackson county grand jury charging him and other members of the Good Government League with burglary not in a dwelling house, committed on February 20, 1933, and connected with the taking of ballots from the courthouse at Medford.

The sheriff and at least one of his deputies were implicated in the burglary, and a bench warrant for the defendant's arrest on that indictment was issued by the circuit judge and directed to George J. Prescott as constable of the Medford justice's district of Jackson county. At or about ten o'clock in the morning of March 16, Mr. Prescott, accompanied by James O'Brien, a state police officer, went to the defendant's residence for the purpose of serving the warrant. Upon their arrival there, Edith R. Banks, in response to the ringing of the bell, opened the front door a short distance, as far as permitted by a burglar chain. The officers made known their mission and almost simultaneously the defendant appeared in the room with a rifle at his shoulder and shouted, "Look out!" Mrs. Banks immediately stepped to one side and the defendant fired through the narrow opening in the doorway, killing Prescott instantly. The defendant then reloaded his rifle. At the time the shot was fired, E. A. Fleming was in the room with the defendant, and he immediately ran out of the back door of the house. O'Brien went for aid, and later, without further trouble, the defendant surrendered to peace officers.

Soon after the defendant was taken into custody a search was made of his residence and there were found, on a table in the room where defendant had stood at the time the shot was fired, a 30-06-caliber

Newton rifle, loaded, and a .44-caliber Smith & Wesson revolver, loaded, in a holster. The state contends, and the defendant admits, that the fatal shot was fired with this rifle. In a back room, during this search, was found additional ammunition for the rifle and the revolver above mentioned, and for a .32-caliber Winchester.

Later, about four o'clock in the afternoon of the same day, a further search of the defendant's house was made by two state police officers, and they found on a cot, with a woman's coat thrown over them, "in a hallway leading from the front part of the house or from the dining-room to the rear", a .32-caliber automatic pistol, holster, cartridge belt and loose cartridges. Between the time of the first search and that of the second the defendant's house had been open and a great many people had gone through it.

Prior to the time that Constable Prescott went to the defendant's residence to serve the bench warrant the defendant had made the statement to at least two individuals that he would not submit to arrest. To one he said that he would "pluck out the heart" of any man who came to his door to serve papers, and to another, that "no man could come through that door and take me. They will take me over their dead bodies, feet first."

There was evidence to the effect that in the morning of March 16, before the arrival of the constable, the defendant had typed or caused to be typed a letter and carbon copy thereof addressed jointly to C. McCredie, chief of police of Medford, and to Captain Bown of the state police. The letter and the copy were placed in separate envelopes and addressed respectively to the chief of police and to the state police officer. In this letter the defendant stated that he had committed no

crime and would refuse to submit to arrest, and that any effort to arrest him would result in bloodshed. These letters were found unopened, according to some of the testimony, on a mat on the front porch of the Banks home, about the time that the body of Prescott was removed therefrom by officers.

■■ The first assignment of error is based on the admission in evidence, over the objection of the defendant, of the .32-caliber automatic pistol, holster, belt of cartridges and loose cartridges found on the cot in the hallway of the defendant's house. The ground of the objection was that such evidence was "wholly incompetent, irrelevant and immaterial, and not within any of the issues of the case, * * * not binding upon the defendants or either of them"; that the evidence did not in any way connect these articles with the defendants; and that they were found in the Banks residence long after the two defendants had been removed therefrom and many other people had been within the house. In their argument, counsel for the defendant contend that the defendants admitted that Prescott was killed by a shot from the Newton rifle which had previously been introduced in evidence and that both defendants testified that they did not own or have any knowledge whatever of the presence within the house, or the ownership of, the pistol and ammunition found on the cot.

Whatever the defendants may have admitted or testified to would not in any way relieve the state of the necessity of proving its case. The only plea of the defendants was that of not guilty, and until their testimony was given the state was in no position to know what might be admitted by them. In order to convict the defendants of murder in the first degree it

was necessary to show that they had purposely and of deliberate and premeditated malice killed Prescott. To substantiate this charge testimony was introduced to show that the defendant Llewellyn A. Banks had made certain threatening statements tending to indicate that the crime was premeditated. Evidence of preparedness on his part to resist arrest and to carry out threats previously made by him was material and relevant to prove the elements of the crime with which he was charged. As said in *State v. Wintzingerode,* 9 Or. 153: "So if neither of the guns in evidence had actually been used in committing the murder, but the circumstances under which the prisoner obtained and kept possession of them would justify the inference that he had obtained them for that purpose, such circumstances might be shown as bearing on the question of his intent."

There was no direct evidence connecting the defendants or either of them with the ownership of the pistol and ammunition found on the cot. If those articles had been found before the house had been left open to the public, there could be no question that their admission would have been material, as in that case the jury could at least have inferred from their presence in the house that they were owned or under the control of the defendants. The mere fact that they were found a few hours later, on the day of the commission of the crime, would not of itself render incompetent their admission in evidence. On this point we find the following statement in 16 C. J. 619, § 1225: "The fact that a considerable length of time elapsed after the crime before the weapon or instrument was found, or that in the meantime third persons may have had access thereto, goes to the probative force, but not the admissibility of the evidence."

With reference to a similar question, the opinion in the case of *Commonwealth v. Retkovitz,* 222 Mass. 245 (110 N. E. 293), held:

"There was evidence that the defendant had threatened to shoot the woman. Thereafter, he was arrested and a revolver, found at that time under the stairs of the first floor of the house, on an upper floor of which he had a room, was admitted in evidence. In this there was no error. Whether it was under the control of the defendant and whether, if so, it indicated ill will toward the dead woman and preparation to do injury to her, were material questions for the consideration of the jury."

In *State v. Harris,* 66 Mont. 34 (213 P. 215), the court, in referring to the admission in evidence of two pistols which were found during a search after the crime had been committed, observed:

"In our opinion these weapons were properly admissible in evidence; the general rule being that weapons found at or near the place of arrest are properly admitted in evidence as a part of the history of the arrest, and as bearing on the crime, although not clearly shown to have been the property of the accused or used in the commission of the crime."

There was involved in the case of *People v. Nakis,* 184 Cal. 105 (193 P. 92), the question of whether or not a pistol and certain clothes found three weeks after the murder were admissible in evidence. The court, in upholding their admissibility, said:

"It was not error to admit in evidence the pistol and bag of clothing found at the time of defendant's arrest near the spot where he was taken into custody. The fact that a period of three weeks had elapsed between the date of the murder and the time of the arrest might affect the weight of this particular evidence, but would not render it incompetent. As was stated in the case of People v. Mar Gin Suie, 11 Cal.

App. 42, 50 (103 P. 951, 955) : 'As a part of the original case of the people, we think the testimony with regard to the finding of the pistols was proper as furnishing a circumstance bearing upon the charge, whether directly or remotely, was for the jury to decide in view of all the other facts and circumstances.' People v. Fitzgerald, 138 Cal. 39 (70 P. 1014) ; People v. Argentos, 156 Cal. 720, 726 (106 P. 65).''

See also in this connection, *People v. Mar Gin Suie,* 11 Cal. App. 42 (103 P. 951) ; 2 Wharton, Criminal Evidence (10th Ed.) p. 1499, § 753; 1 Wigmore on Evidence (2d Ed.) p. 319, § 83.

No error was committed by the trial court in admitting in evidence the automatic pistol and ammunition found on the cot in defendant's house.

■ Dr. S. E. Josephi was called as an expert witness on behalf of the defendant and was asked whether or not, from his examination of the defendant and from the latter's testimony, he had formed any opinion as to whether or not the defendant was able ''to distinguish between right and wrong''. In commenting upon the objection made by the state to this question, the court observed:

''I think it would be competent for the doctor to testify from his examination, from his observation of the defendant and from assuming the facts that have been testified to be true, listening to the testimony, as to whether or not in his opinion the defendant was on the 16th day of March, 1933, at the time of the alleged shooting, sane or insane. Now then, as to whether or not he was able to distinguish right from wrong: It seems to me under the authorities it would be a question of fact for the jury to say, based on all the facts and circumstances in the case and on the testimony of the doctor. Now I believe that is the rule.''

Thereupon Mr. Lonergan, of counsel for the defendant, stated : ''Well, I am not going to quarrel about

the form of the question because it is a waste of time, so I shall adopt the court's suggestion for my question and proceed.'' He then asked the witness the following question:

"I will ask you then, Doctor, as the result of your examination of Llewellyn A. Banks, and the observations that you made of him and the hearing of the testimony that was given by him from the witness stand, and assuming those statements to be true, what is your opinion as to whether or not on the 16th day of March, 1933, at the time of the shooting of George Prescott, defendant Llewellyn A. Banks was sane or insane?''

To this the witness answered that in his opinion the defendant, at that time, was insane. No ruling was made by the court on the objection to the question first asked this witness. There was nothing connected with the recited proceedings which could be made the basis of an assignment of error. As a matter of fact, the question was abandoned by counsel for the defendant, evidently as being, in his opinion, inconsequential.

██ Under the heading of ''Assignments of Error Nos. III, IV and V'', the defendant complains that ''the court committed error in refusing to give several of the instructions as requested by the defendant, as set out on pages 17 to 20 (Short Bill of Exceptions)''. In attempting to make these assignments of error the defendant has failed to comply with Rule 10, subdivision 2, of this court, specifying that each assignment must be separately stated and the alleged error must be clearly and succinctly pointed out. These assignments have to do with the refusal of the court to give three instructions requested by the defendant, to-wit: requested instructions V, VI and XIX. The first of those is as follows:

"Deliberation and premeditation must have arisen while the mind was in its normal state and while the defendant, Llewellyn A. Banks, was master of his own passion and temper, not influenced by any personal provocation or sudden heat of anger arising from any real or fanciful cause, and the design must not have been formed hastily upon the occasion. I further instruct you that as to the defendant, Llewellyn A. Banks, some evidence has been offered on behalf of this defendant, to the effect that at the time of the shooting of George Prescott, the mind of the defendant, Llewellyn A. Banks, was not normal but was deranged, to the extent that he was at the time irresponsible, and insane, and in this connection I instruct you that under the definition I have given you deliberation and premeditation must be proven by the state beyond a reasonable doubt before you can convict the defendant, Llewellyn A. Banks, of the crime of murder in the first degree."

Without attempting to pass upon the correctness of that part of the first sentence above quoted to the effect that "deliberation and premeditation must have arisen while the mind was in its normal state and while the defendant was   *   *   *   *not influenced by any personal provocation"*, it is sufficient to say that the first part of the requested instruction was fully and clearly covered by the following instruction given by the court:

"To constitute the crime of murder in the first degree it is essential that a deliberate and premeditated design to kill precede the killing for some appreciable length of time sufficient for reflection and consideration upon the matter and the formation of a definite purpose to kill, and it matters not how short that time is, it is sufficient for that purpose if the design to kill is formed and matured while the mind is in its normal state and under the control of the slayer.

"It is not necessary that the deliberate intent to kill should have been formed for any specific length

of time prior to the act. It is enough if it exists at all at the time of the killing if it was formed while the mind was in its normal state, under the control of the slayer and not in the heat of passion. * * *

"The deliberation and premeditation necessary to constitute murder in the first degree shall be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cool blood and not hastily upon the occasion."

As to the balance of the above requested instruction, the court told the jury that "deliberation and premeditated malice are necessary elements to constitute the crime of murder in the first degree," and further defined those terms and instructed the jury that the state must prove beyond a reasonable doubt the elements constituting murder in the first degree. The court further instructed the jury upon this subject as follows:

"I have already instructed you the defense has interposed on behalf of Llewellyn A. Banks that at the time of the shooting of George J. Prescott the mind of said Llewellyn A. Banks was not normal, but was deranged, and that he was suffering from what has been termed transitory mania. I instruct you that the defense is a legal and proper defense to interpose, and it is your duty under your oath to give this evidence on this branch of the case the same careful consideration that it requires of you as to all other parts of the case. If you find that the defendant, notwithstanding some mental disease or infirmity, if he did have a mental disease or infirmity at the time of the alleged crime, if he had reason enough to know the act which he committed, if he did commit the act, was wrong and unlawful, and if he knew the nature and quality of the act, and if he had the power to do or refrain from doing the act charged as a crime, such mental disease or infirmity, if any, would not avail as a defense in this case."

The instructions given by the court, quoted above, and others, fully covered all essential matters contained in the foregoing requested instruction No. V. Moreover, since that requested instruction was limited in its applicability to first degree murder only, it is difficult to conceive how the defendant could have been prejudiced, had nothing been said by the court on that subject.

Defendant's requested instruction No. VI defined first and second degree murder, pointed out the distinction between the two crimes, and continued as follows:

"In connection with the definition I have given you of murder in the second degree, I instruct you that some evidence has been offered on behalf of the defendant, Llewellyn A. Banks, tending to show that the mind of the defendant Llewellyn A. Banks was not normal at the time of the shooting of George Prescott, but was deranged and that he was irresponsible, and in this connection I instruct you that before you can find the defendant, Llewellyn A. Banks, guilty of murder in the second degree you must find from the evidence beyond a reasonable doubt that Llewellyn A. Banks purposely and maliciously killed George Prescott, and if you have a reasonable doubt that his mind was so deranged and in such condition that he was incapable of forming the mental purpose with malice, then you would not be warranted in finding the defendant Llewellyn A. Banks guilty of murder in the second degree."

Some features of this requested instruction were covered by the court in the instruction given which we have last above quoted. The court also instructed the jury on the defense of insanity and on all the other matters covered by the requested instruction last above quoted.

The last instruction in this group, No. XIX, requested by the defendant and not given by the court, related to self-defense, and the substance thereof was covered in detail by the court's charge to the jury.

■ In this connection, although not properly making an assignment of error thereon, the defendant contends that the trial court erred in instructing the jury as follows:

"To justify homicide, the defendant may act upon an honest or well founded belief that it is necessary to take life to prevent death or great bodily harm to himself. The danger must be so urgent that the killing is absolutely or apparently absolutely necessary."

This instruction is in keeping with the decisions of this court in *State v. Porter,* 32 Or. 135 (49 P. 964), and *State v. Holbrook,* 98 Or. 43 (188 P. 947, 192 P. 640, 193 P. 434).

The remaining assignments of error, Nos. VI and VII, are based on the refusal of the trial court to grant defendant's motion for a new trial. After the verdict had been returned on May 21, 1933, and before the entry of judgment of sentence on August 14 following, the defendant filed a motion and a supplemental motion for a new trial. In these motions allegations of many errors committed during the trial of the case are set forth, but in appellant's brief and on the argument here, only a few of the alleged errors have been mentioned.

■ One of the grounds assigned for a new trial and here urged is based on the affidavit of I. J. Yates, one of the jurors, who as affiant states that Mrs. Thomas Bailey, bailiff for the women of the jury from the time of its impaneling until its retirement for deliberation, made a statement to him in substantially the following

language: "My, my, this is going to be a hard case." The affidavit declares that Yates replied, "We have to do our best"; and that Mrs. Bailey then said: "My, my, this is Catholics against Protestants." The statements contained in this affidavit are specifically and emphatically denied in a counter-affidavit by Mrs. Bailey. There is nothing, however, in the above remarks, even if made as alleged, to indicate that Mrs. Bailey was advocating either a conviction or an acquittal, or that the juror was thereby influenced in any way. The record shows that this was a difficult case and that apparently the jurors did their best in arriving at what they considered a just and correct verdict.

■ Lee Young, an alternate juror who was relieved from further service upon the retirement of the jury, made an affidavit which is attached to the supplemental motion. This states that the jury was in charge of Thomas Wells as bailiff, and that "during the trial of said cause Thomas Wells, the bailiff, in my presence and I believe in the presence of Mr. Dunn, members of the jury, made the following statement: 'No question but what the man is guilty, all right', to which I replied, 'I can not see where we have any right to talk about the case'. The bailiff, Thomas Wells, then answered, 'Of course we have to talk a little', and at that time the state, the plaintiff, had not yet completed its presentation of its case in chief against the defendant, and the defendant had not presented any evidence on his behalf".

This affidavit was served and filed on August 11, 1933, the date on which the court denied the motion for a new trial. On that day the assistant attorney general who was in charge of the prosecution filed a counter-affidavit to the effect that Thomas Wells, the bailiff

mentioned in the Young affidavit, was absent from the state. The affidavit of Mr. Young does not state definitely and as a positive fact that the statement attributed to Wells was made, or the conversation referred to was had, in the presence of Mr. Dunn, another juror. Had the affiant intended to convey the idea that what was said was, or could have been, heard by Mr. Dunn, he doubtless would have made a direct statement to that effect. No affidavit by juror Dunn in corroboration of the alleged conversation is produced. Since Mr. Young was not a member of the jury that decided the defendant's fate, the defendant could not have been prejudiced by the statement alleged to have been made by Wells, and the court would not be warranted in holding that there was misconduct on the part of bailiff Wells so far as juror Dunn was concerned, on the indefinite and unsatisfactory showing contained in and limited to the Young affidavit.

Attached to the original motion for a new trial is the affidavit of the defendant to the effect that the assistant attorney general in charge of the prosecution of the case, during the course of his opening argument to the jury and while standing before the jury, "pointed at me during his argument, with his forefinger, and denounced me to the jury with the following language of and towards me and directed at me and indicating myself in the manner above stated, and said to the jury that I, the said Llewellyn A. Banks, was a dirty coward and was hiding behind the skirts of a woman, to wit, my wife, Edith R. Banks, who was also a defendant in said cause; and while so doing also stated that I had throughout my life led an unmoral life and was a supreme egotist and had disregarded every moral obligation to my fellow man throughout my life". The defendant further stated in his affidavit that the official

court reporter's notes taken at the time would show the exact language used by the assistant attorney general, and that "objection was made by my counsel at the time and exception taken to the said remarks, and I refer to the official court reporter's notes in reference to all of the said matters herein set forth". The defendant further declared that the affidavit was made for the reason that the court reporter was absent from the city of Eugene and that affiant was unable at that time to obtain a transcript "with reference to said argument and said occurrence".

This affidavit was made on June 20, 1933, and the motion was not disposed of until August 11 following. Meanwhile no attempt, apparently, was made to produce the court reporter's notes of the trial. The only record before us with reference to the incident, other than the defendant's recital in his affidavit, is the following excerpt from the transcript of the proceedings:

"During the opening argument of Mr. Moody on behalf of the state, the following occurred:

"Mr. Lonergan: We object to any attempt on the part of the state's attorney in making a personal attack on the defendant.

"Mr. Moody: I am arguing the evidence.

"Mr. Lonergan: Wait until I get this record. Making a personal attack on the defendant in the presence of the jury, using strong and vicious terms towards the defendant and which is a breach on the part of the district attorney and has been so held by the supreme court and I assign it as prejudicial error and I ask for a mistrial in this case. Mr. Moody turning to the defendant and pointing his finger at him, called him a coward and hiding behind the skirts of a woman, or words to that effect.

"The court: I think it would be proper for counsel in addressing the jury to address those remarks solely to the jury but the language used by counsel is such

that he may draw his own conclusion from the evidence and is squarely within the decisions of our court and the law, and the objection is overruled.

"Mr. Lonergan: Save exceptions, your honor.

"The court: Take your exception. You may proceed."

In opposition to the motion for a new trial the assistant attorney general filed a counter-affidavit stating that he had not made any improper remarks prejudicial to the defendant, during his argument. No attempt has been made by the defendant to show, otherwise than as above set out, what actually was said by the prosecutor. Neither the defendant, in his affidavit, nor his counsel in the objection above quoted, attempted to recite the exact language used by the attorney representing the state. The defendant's affidavit, moreover, does not show what action, if any, was taken by the court regarding these alleged improper remarks. The court can not lay down any definite and precise rule as to the conclusions which may be drawn, and voiced, by the prosecutor, from the evidence in the case. The prosecutor should always bear in mind, however, that his duty is to protect the innocent as well as to bring the guilty to justice, and he ought to refrain, as far as possible, from inflaming the minds of the jurors against the accused by improper invective. The conduct of the trial and the scope of counsel's argument must be left, to a large extent, to the discretion of the trial court. It is not apparent, from the record before us, that any prejudicial error was committed by the court in this respect: *People v. Kromphold,* 172 Cal. 512 (157 P. 599); *People v. Cona,* 180 Mich. 641 (147 N. W. 525).

■ At the time of the hearing of the motion for a new trial the court seemed to be of the opinion that inas-

much as more than 60 days had elapsed since the return of the verdict, the motion for a new trial was, under § 2-803, Oregon Code 1930, automatically denied. There is some question as to whether or not the trial court gave the same consideration to the motion and supplemental motion for a new trial that otherwise would have been given, had not the court entertained this view of the law. The statute above mentioned refers to the entry of the judgment, and not of the verdict, and therefore under the statute before the 1933 amendment thereof became effective, the 60 days should have been computed from the entry of the judgment. The amendment reduced the time to 55 days.

The grounds on which the motion for a new trial was based were not, in any event, sufficient to warrant a new trial, and no error was committed by the trial court in denying that motion.

As we find no error in the record, the judgment appealed from is affirmed.

KELLY, J., did not participate in this decision.