Argued March 20; affirmed May 13; rehearing denied June 17, 1941

# SUKO *v.* NORTHWESTERN ICE & COLD STORAGE CO. ET AL.

(113 P. (2d) 209)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND and ROSSMAN, Associate Justices.

*C. D. Phillips*, of Portland (Griffith, Peck & Coke and Maurice W. Seitz, all of Portland, on the brief), for appellant.

*Leo Levenson*, of Portland (Prendergast & Prendergast, of Portland, on the brief), for respondent.

BAILEY, J. This action was brought by Albert Suko against Northwestern Ice & Cold Storage Company, a corporation, and the officers and trustees of E. Henry Wemme Endowment Fund, a charitable corporation, to recover damages for personal injuries suffered by him as the result of the bursting of a water tank. An involuntary nonsuit was entered against the plaintiff and in favor of the officers and trustees of the charitable corporation. From a judgment in favor of the plaintiff and against the cold storage company that defendant appeals.

On October 1, 1929, the charitable corporation leased to the cold storage company, which hereinafter will be referred to as the defendant, the south 120 feet of block 72, East Portland, within the corporate limits of the city of Portland, for a period of 50 years at a monthly rental of $406.50 for the first 158 months of the term and the sum of $10 per year for the remainder thereof, with an option to the lessee to purchase the property at any time within the first 158 months of the demised term for $44,336.85, the lessee to receive credit on the purchase price for $280.60 per month from the date of the lease to the time of purchase. At the time the plaintiff was injured the defendant had not exercised the option.

The leasing agreement between the defendant and the charitable corporation provides that:

"The lessor shall not be required to make any repairs, alterations, additions, or improvements to or upon said demised premises during the term of this lease; and the lessee hereby agrees to maintain and keep said premises in good repair and condition, including the replacement of broken glass, during the entire term of this lease at its own cost and expense. The lessee is given the right and privilege to make improvements and additions upon said property in order to adapt

said property and the buildings thereon to the uses of said lessee, . . .

\* \* \*

"That the lessor shall in no wise be liable for any accident or injury to any goods or person whatsoever happening in or about said premises, . . . and that the said lessor shall not be responsible or liable in any way for damage to life, limb or property caused in or about said premises . . . nor shall the lessor be liable for any damage or loss to person or property caused by or as a result of any business conducted upon said premises, or by reason or as a result of the lessee's occupancy of said premises, . . . or by reason of the negligence of any person whomsoever in or around said premises".

When the lease was entered into there was located on the demised property a four-story reinforced concrete building approximately 50 feet in height. The west end of the building faced Northeast Third avenue. On the top of the building, at the extreme northwest corner thereof, was a reinforced concrete superstructure or platform approximately 18 feet above the roof of the building, on which platform stood a circular tank used to store water for fire protection in connection with an automatic sprinkler system. The tank was about 16 feet in diameter and 24 feet high, constructed of wood and bound with steel hoops. It had a capacity of 30,000 gallons, but was not kept wholly filled, so that the water level was generally a foot below the top. At the time of bursting it contained between 25,000 and 30,000 gallons of water.

The defendant first went into possession of the leased premises late in 1927 or early in 1928, and altered and remodeled the building to adapt it for use as a cold storage plant. The tank above mentioned had been built in 1923 or 1924, replacing a similar tank built in 1912.

The hoops from the original tank were used again in the construction of the second one. The defendant did nothing to the tank, except to paint it once, in 1936.

Immediately north of the defendant's building, separated from it only by a driveway and facing on Northeast Third avenue was a one-story duplex house, the north half of which was occupied by the plaintiff and his family.

About seven-thirty o'clock in the evening of January 19, 1938, the water tank burst, scattering wooden staves and metal hoops in all directions. The west or front end of the south half of the duplex house was completely demolished. Part of the roof of the plaintiff's half of the house was torn away and a large hole made in the ceiling, through which staves or timbers and pieces of metal from the tank fell into the plaintiff's living-room, crushing the furniture and breaking the floor. Added to this, water poured in, "like the river was coming through there", to quote the plaintiff's testimony.

When this happened the plaintiff was in the living-room of his home, lying on a davenport, from which he was thrown to the floor. The house was placed in darkness, and in attempting to rescue his children the plaintiff fell through a break in the floor. In describing his efforts to arise he thus testified:

"Oh, I laid there it seemed like ages, until I could get up. I just couldn't get up. I tried to get up and the water kept getting in my eyes and mouth, and swallowing stuff; I would spit it up; I would turn around and something hit me on the back of the head, and I laid there, and I don't know just how long; it took an awful long time. And I finally staggered to my feet and I picked up the girl and took her out in the kitchen."

The plaintiff sustained severe, painful and disabling injuries, which it is not necessary here to set forth in detail. As a result of the mishap he incurred medical expenses and suffered further loss through the damage done to his household furnishings.

The complaint charges the defendant and the charitable corporation, in favor of which, as above mentioned, a judgment of involuntary nonsuit was entered, with the following acts of negligence:

"That said tank and its supports were approximately 25 years old, and the timbers, staves, beams used in its construction had become weak, rotten and decayed, and that the defendants had taken no steps to replace, rebuild or repair any of the weak, rotten and decayed portions of the tank, or the rotten, and decayed staves, beams and timbers thereof. That a proper inspection would have revealed the condition of the said tank and its supports and that the defendants failed to make a proper or any inspection of said tank and its supports, and that the defendants failed to make a proper or any inspection of said tank and its supports to determine the strength and soundness thereof. That said tank and supports were so situated that any collapse would cause the beams, staves, timbers and water to fall in the premises in which the plaintiff was living.

"That the collapse of the said tank and the supporting tower was caused solely by the carelessness, recklessness and negligence of the defendants, and of each of them, in that said defendants, and each of them, owned and/or maintained said tank, and its supports and over 5,000 gallons of water therein in such a position, and in such a manner that the falling or collapse of said tank and/or its supports would cause the staves, timbers, beams and water to fall upon the plaintiff, his property, and the premises wherein he was living; and in failing to take proper or any precautions to prevent said tank, its supports and water from falling upon the plaintiff, his property and the premises wherein he was

living; and that said defendants, and each of them, maintained said tank with over 5,000 gallons of water therein when said tank and its supports were over 25 years old, and in that said defendants, and each of them, permitted said tank and supports to become weak, rotten and decayed, and failed to take proper or any steps to repair, replace or rebuild the rotten and weakened portions, staves and timbers, and failed to make a proper, or any inspection of said tank and its supports to determine the condition thereof, and failed to inspect or tighten or repair the hoops holding said tank together; and in maintaining said tank with broken hoops thereon, and without sufficient hoops thereon to properly support the tank of its age with over 5,000 gallons of water therein.''

Two assignments of error are based on the refusal of the circuit court to grant the defendant's motions for an involuntary nonsuit and for a directed verdict in its favor. The grounds of the two motions are practically the same, and therefore these assignments may be considered together.

The defendant argues in support of these two assignments of error that the evidence fails to disclose any negligence attributable to it in connection with the bursting of the tank. It further asserts that if any negligence was proved it was referable to the original construction of the tank.

■ The premises on which the tank was located were in the exclusive possession and control of the defendant. The volume of water kept in the tank was a matter under the defendant's sole direction. The greater the volume of water therein, the greater was the danger of the tank's bursting. As said in 3 Kinney on Irrigation and Water Rights, 2d Ed., § 1669, page 3069: ''Water, at times, is a most dangerous element even flowing in its natural condition, without the influence

of man; and, when formally restrained by the works of man, it suddenly breaks through its barriers and tears through the lands below to the great destruction of life and property, it becomes even more dangerous. Therefore, in a previous section of this work, we stated to the effect that it is the duty of all irrigation or water companies, especially in the construction of dams and reservoirs for the storage or the holding back of great quantities of water, to so construct them that they will be of such a strength as to withstand all pressure of water on both ordinary and extraordinary occasions, so far as skilled human foresight can determine, and with that reasonable degree of care as is commensurate with the nature and magnitude of the undertaking, in order to protect the lives and property of those below.'' See, also, in this connection: *Esson v. Wattier*, 25 Or. 7, 34 P. 756; *Mallett v. Taylor*, 78 Or. 208, 152 P. 873; *Rylands v. Fletcher*, L. R. 3 H. L. 330; *Weaver Mercantile Company v. Thurmond*, 68 W. Va. 530, 70 S. E. 126, 33 L. R. A. (N. S.) 1061. The defendant, when it brought water upon the premises under its exclusive control and stored it in an elevated tank, was bound to exercise a degree of care proportionate to the injuries likely to result to others, if the tank should prove incapable of confining the water.

In *Weaver Mercantile Company v. Thurmond*, supra, a case involving the bursting of a tank containing water, it was argued that the tank was constructed of apparently good material and in a workmanlike manner; that any defect in material or fault in construction was latent; and that the defendant was ignorant of such defect and therefore was not liable, because not negligent. To this the court answered: ''But, as we understand the law to be, the liability of defendant

does not depend on negligence in construction, but upon negligence in not keeping the water confined. No matter in what the negligence consisted, it is proved by the bursting of the tank. The rule *res ipsa loquitur* applies. If the person whose duty it was to keep the tank in good repair had not been negligent in some respect, the tank would not have burst.''

■ In the instant case the plaintiff did nothing to cause the bursting of the tank. In the ordinary course of matters the mishap would not have occurred except through carelessness in the construction, inspection or use of the tank. And, as hereinabove stated, the premises on which the tank was located were in the exclusive possession and under the direct control of the defendant. Therefore, the doctrine of *res ipsa loquitur* applies: 3 Cooley on Torts, 4th Ed. § 480, page 369; 5 Wigmore on Evidence, 2d Ed., § 2509, page 498; *Kelly v. Lewis Investment Co.*, 66 Or. 1, 133 P. 826, Ann. Cas. 1915B, 568; *Gillilan v. Portland Crematorium Association*, 120 Or. 286, 249 P. 627.

■ The fact that the plaintiff in his complaint charged the defendant with specific acts of negligence does not deprive him of the benefit of the doctrine of *res ipsa loquitur*, so far as concerns the acts alleged: *Boyd v. Portland Electric Co.*, 40 Or. 126, 66 P. 576, 57 L. R. A. 619; *Boyd v. Portland Electric Co.*, 41 Or. 336, 68 P. 810; *Francisco v. Circle Tours Sightseeing Company*, 125 Or. 80, 265 P. 801. See also the annotation in 79 A. L. R. at page 56.

■ The plaintiff was not required to give direct evidence of negligence on the part of the defendant, inasmuch as proof of the manner in which the accident occurred was in itself, under the rule of *res ipsa loquitur*, a *prima facie* showing of negligence. He did, however,

produce testimony to the effect that the hoops binding the tank were at least twenty-six years old; that they were not placed close enough together to secure the staves against pressure of the large volume of water in the tank; that some of the hoops had been broken prior to the accident; and that a careful examination of the hoops by a qualified inspector would have disclosed the defective condition of some of them, although the fractures in such hoops would not have been visible or discernible "from an ordinary inspection".

The defendant called as expert witnesses an engineer who had examined the tank immediately after it was built and who gave it as his opinion that the tank was properly constructed and capable of withstanding the pressure to which it was subjected, and another licensed and registered engineer who was employed by the Fire Adjustment Rating Bureau and had inspected the tank in question some nineteen times between 1927 and 1937. The main purpose of the latter engineer's inspection on all those occasions was to note the level of the water in the tank and to ascertain whether the tank was leaking or had any defects apparent to casual observation. He made no examination such as a structural engineer would make. In addition, some of the defendant's employes testified that they were on the roof of the defendant's building several times a week and would glance at the tank, to look for leaks, and at times would climb to the top of it to ascertain the water level. There appears not to have been made by the defendant, during all the time it was in possession of the property, any examination of the structural condition of the tank.

■ When the plaintiff proved the collapse of the tank and the injuries suffered by him as a result thereof,

he made out a *prima facie* case of negligence on the part of the defendant. So far as we have been able to ascertain from the record, no attempt was made by the defendant to prove the cause of the bursting of the tank. Its effort was to show only that it was not at fault. It was a question for the jury, with all the evidence before it, whether the preponderance of such evidence was in favor of the plaintiff: *Sweeney v. Erving*, 220 U. S. 233, 57 L. E. 815, 33 S. Ct. 416, Ann. Cas. 1914 D, 905; *Chenoweth v. Southern Pacific Co.*, 53 Or. 111, 99 P. 86; *Gillilan v. Portland Crematorium Association*, supra; *Hansen v. Oregon-Washington R. & N. Co.*, 97 Or. 190, 225, 188 P. 963, 191 P. 655; *Mayes v. Kansas City Power & Light Co.*, 121 Kans. 648, 249 P. 599; *Goldstein v. Levy*, 132 N. Y. S. 373; *Feeney v. New York Waist House*, 105 Conn. 647, 136 A. 554, 50 A. L. R. 1539; *Chicago, M. & St. Paul Ry. Co. v. Irving*, 234 F. 562. No error was committed by the trial court in denying the motions for a nonsuit and for a directed verdict.

■ Among others, the following instruction was given by the court to the jury:

"The court charges the jury that if you find from a preponderance of the evidence that reasonable care requires the duty of one maintaining a structure such as a water tower to have it inspected from time to time and as often as an ordinary and prudent person, under all the circumstances, would do, by one qualified by skill and knowledge in such matters, and if you believe by a preponderance of the evidence that the defendant, in the maintenance of said water tower, failed and neglected to exercise such a degree of care, then it would be guilty of negligence, and if such negligence was the proximate cause of plaintiff's injuries, if any, your verdict should be in favor of the plaintiff.

"On the other hand, if you find from the evidence that the test of ordinary care under the circumstances is not that degree of care or prudence that would be expected of an expert in mechanics or building construction, or the construction of water tanks, and that all that could be expected of the defendant, Northwestern Ice and Cold Storage Company, under the circumstances, would be to exercise the same degree of care that an ordinarily prudent man would exercise who was unskilled in such mechanical construction, and if you find from the evidence in this case that the plaintiff has failed to prove, by a preponderance of the evidence, that the defendant, Northwestern Ice and Cold Storage Company, has failed to exercise that degree of care, then your verdict should be for the defendant, Northwestern Ice and Cold Storage Company, against the plaintiff."

The defendant excepted to the foregoing instruction on the ground "that it is not incumbent upon the defendant to use a highly skilled tank expert for making any inspection", and on the further ground of the court's "submitting to the jury the question for determining what qualifications an expert must have in making an inspection."

In this connection, relative to the care which the defendant was required to exercise in regard to the maintenance and use of the tank, the defendant excepted to the court's refusal to give two instructions requested by the defendant, one of which was as follows:

"You are instructed that the test of ordinary care under the circumstances is not that degree of care or prudence that would be expected of an expert in mechanics or building construction, or the construction of water tanks. All that could be expected of the defendant, Northwestern Ice and Cold Storage Company, under the circumstances, would be to exercise the same

degree of care that an ordinarily prudent man would exercise who was unskilled in such mechanical construction. If you find from the evidence in this case that the plaintiff has failed to prove, by a preponderance of the evidence, that the defendant, Northwestern Ice and Cold Storage Company, has failed to exercise that degree of care, and further proved [prove] by a preponderance of the evidence that such failure was the proximate cause of the damage claimed by the plaintiff, then your verdict should be for the defendant, Northwestern Ice and Cold Storage Company.''

We need not here refer to the other requested instruction on this subject, for the reason that the substance of it, in our opinion, was included in the charge given by the court.

The trial court, before giving the instruction above quoted to which the defendant excepted, had charged the jury that the defendant was ''not an insurer against an accident such as happened in this case'', and that the fact that the tank collapsed and the plaintiff was injured did not of itself make the defendant liable. The court further instructed the jury that it was the duty of the defendant ''to have and maintain the water tower in a reasonably safe condition, that is to say, defendant had to exercise in that respect that degree of care that a person of ordinary prudence would exercise under the same circumstances and conditions.'' The court then left it to the jury, by the instruction first above quoted, to determine whether the exercise of reasonable care, in the light of all the facts in the case, would require of the defendant an inspection of the tank from time to time by ''one qualified by skill and knowledge in such matters'', or would permit an inspection by one ''unskilled in such mechanical construction''.

The care to be exercised by the defendant in this particular case was proportionate to the seriousness of the possible consequences that could reasonably be expected to result from the bursting or collapse of the tank. What would be reasonable or ordinary care under any circumstances is determined by the degree or extent of the damage that might be inflicted by lack of proper care. A very high degree of danger calls for a very high degree of care, which, however, amounts to no more than ordinary care in such a case: 45 C. J., Negligence, §§ 67 and 68; *Hummell v. Seventh Street Terrace Co.*, 20 Or. 401, 26 P. 277; *Garrison v. Armstrong & Co.*, 248 Pa. 402, 94 A. 125; *Chicago, M. & St. Paul Ry. Co. v. Irving*, supra. In certain instances the duty of inspection might clearly require the employment of experts: *Rumetsch v. Wanamaker, New York, Inc.*, 216 N. Y. 379, 110 N. E. 760, L. R. A. 1916C, 1245. The location of the tank here involved, above a busy thoroughfare in a large metropolis, required a greater degree of care in its maintenance and use than would have been the case had it been located in a remote and "lonely district": Restatement of the Law of Torts, § 366.

In view of the conflict in the testimony as to what would be a reasonable inspection of the tank under the circumstances shown, it was for the jury to determine what would constitute a reasonably careful examination of the tank by the defendant. In the instruction requested by the defendant, hereinabove set out, the defendant would have the court tell the jury that all that was required of the defendant under the circumstances was "to exercise the same degree of care that an ordinarily prudent man would exercise who was unskilled in such mechanical construction". Such an

instruction would usurp the jury's right of determining whether the defendant had exercised care commensurate with the peril involved: *Stott v. Churchill*, 36 N. Y. S. 476, affirmed 157 N. Y. 692, 51 N. E. 1094.

There was admitted in evidence as an exhibit a threaded piece of steel with a nut attached. Mrs. Suko, wife of the plaintiff, identified it as having been found by her, along with broken glass and other debris, on her son's bed in the dining-room of their home two days after the accident. She testified that it was similar to the ends of the hoops scattered with wreckage from the tank. Mr. Raynor, who was a professional structural and civil engineer employed in the bureau of buildings, department of public works of the city of Portland, testified that it looked very much like the end of one of the hoops. After the accident Mr. Raynor had made a careful examination of parts of the wrecked tank, and as a witness he described in detail the construction and size of the hoops. The piece of threaded steel was of the same size as the ends of the hoops and had been covered with aluminum paint in the same manner as the hoops. It appeared to have been broken on the end near the nut.

The manifest purpose of introducing this piece of metal as an exhibit was to show that the break in it had existed for some time prior to the bursting of the tank. Its admission in evidence was objected to on the ground that it had not been properly identified as being any part of the tank. The further objection is raised for the first time on appeal, and can not be considered, that there was no evidence that the piece of metal when offered as an exhibit "was in the same condition that it was while it was on the tank."

■ The steel fragment was sufficiently identified to be admitted in evidence. The fact that it had not been discovered by Mrs. Suko until two days after the accident "goes to the probative force but not the admissibility" of this exhibit: *State v. Banks*, 147 Or. 157, 163, 32 P. (2d) 571; *Roberts v. Port Blakely Mill Co.*, 30 Wash. 25, 70 P. 111; *People v. Kynette*, 15 Cal. (2d) 731, 104 P. (2d) 794, 807.

■ The court instructed the jury that if it found from a preponderance of the evidence that the plaintiff was entitled to a verdict, he was "entitled to compensation as damages for his pain and suffering" and that it was for the jury to determine what was a reasonable amount to be allowed him for any physical injuries and mental pain he may have suffered. This instruction was excepted to by the defendant "on the ground and for the reason that the law does not contemplate the allowance of damages for mental pain." That objection has been abandoned on this appeal and it is now argued that there was "no pleading of damages for mental pain". Inasmuch as that ground for excepting to the instruction was not presented to the circuit court it can not here be considered for the first time.

■ The court charged the jury that it might consider the effect of the injuries suffered by the plaintiff upon his earning power, if any, and the loss of wages that he sustained, if any, by reason of such injuries. This was excepted to by the defendant on the ground that "no loss of wages was prayed for in plaintiff's complaint". We believe, however, that this ground of objection is without merit, for the reason that the plaintiff alleged that for more than five months he was unable to work at all and that he "will always be unable to do more than a small part of his work as a

barber, thereby permanently impairing his earning power.'' The prayer of the complaint was comprehensive enough to cover damages for loss of wages.

15. There are numerous other assignments of error urged by the appellant. Some of them have reference to the refusal of the court to give certain instructions requested by the defendant, the substance of which was embodied in the instructions given. Other assignments are based on the court's refusal to give requested instructions to the effect that the rule of *res ipsa loquitur* does not apply to the facts in this case. The decision hereinabove announced, relative to the motions for nonsuit and for a directed verdict, disposes of these latter assignments. The instructions of the court as a whole fairly and fully submitted to the jury the issues involved in the case.

No reversible error was committed by the circuit court and the judgment appealed from is accordingly affirmed.