URE et al. v. UNITED STATES (two cases).
WHITE et al. v. UNITED STATES.

FINE SHEEP CO. v. UNITED STATES.
Nos. 3669 to 3853, 3861 to 3865, 3871,
3855, 3870.

United States District Court
D. Oregon.
March 13, 1950.

Gallagher & Gallagher, Ontario, Or., Robert D. Lytle, Roy Kilpatrick, Vale, Or., for plaintiffs.

Henry L. Hess, U. S. Atty., Portland, Or., William H. Veeder, Sp. Asst. to Atty. Gen., for defendant.

JAMES ALGER FEE, Chief Judge.

The present opinion concerns the responsibility of the United States to one hundred ninety-three landowners, served by the Owyhee Canal, based on two different type claims arising because of the breaking of the canal, which was under government control. The first class relates to damages on account of the failure to deliver water because of the break, whereby crops were lost. The second class relates to direct trespass of the water upon lands as a result of the break. These cases were consolidated for the purpose of pretrial conference and of taking evidence as to liability. A representative of the cases depending upon failure to deliver water is that of White's. One of the cases of the Ure's was chosen as illustrative of the causes where damage was claimed by floodings.

After a pretrial conference in these causes, there was entered a pretrial order, from which the agreed facts are drawn for the purpose of this memorandum. The Whites claim to own certain land, which it is agreed is situated within the boundaries of the Owyhee Reclamation Project, and that the irrigable area thereof is arid. The land is also within the Owyhee Irrigation District, a quasi municipal corporation of the State of Oregon, which entered into a contract with the United States in 1926. By this contract, the District agreed that it would indemnify and hold harmless United States against any and all costs arising from construction, operation and maintenance of the irrigation system constructed by the defendant to reclaim and serve the irrigated acreage. It is further agreed that on account of drought, inaccuracy in distribution or other causes, there may be shortages in the water supply, and, "while the United States will use all reasonable means to guard against such shortage," the latter and its agents shall have no liability therefor. Sheff White, one of the plaintiffs, entered into a contract with the District, confirming and consenting to the terms of the contract above set out, binding himself, his successors and the irrigable lands to the terms and conditions. The contract was confirmed by decree of a court of competent jurisdiction.

During all of the year 1946, United States was in control of and operating the Owyhee Reclamation Project, including the North canal, which is approximately seventy miles long. A break occurred therein on Sunday, July 14, 1946, at a point about thirty-six miles from the head of the canal. The agents of the government had turned the water into the canal and were controlling the flow of the stream therein. The break was approximately fifty feet wide at its widest point. Water in the canal, which could not be diverted from the canal above and below the break, drained out through the break. Repair work was immediately commenced. On Thursday, July 18, repairs had progressed to a point where the engineer in charge ordered water turned into the canal, which was done. A second break occurred at approximately 1:30 a. m., July 19, 1946, downstream from the first break.

The Whites had paid all water assessments levied by the District against the irrigable land. Although it is not expressly stipulated, there is no doubt but what the crops depending upon irrigation water were damaged by the lack thereof at the season wherein the breaks occurred.

The Whites have made many contentions as to the failure of the United States to furnish water to mature the crops growing on these lands, but, for the purposes of this opinion, they may be summarized briefly. They contend, as far as crop damage was concerned, that they became parties to the contract between the District and the Government and were entitled to the delivery of the water, to which they had legal title as appurtenant to the realty. It is contended that the United States owed a duty to exercise reasonable care in the construction, operation and maintenance of the canal, and that the breach of this duty in several particulars proximately resulted in the break and the failure to deliver water to the land of the Whites for the period from July 14 to July 31. The

amount of the damage was reserved by the Court for trial in the event the issue of liability was determined against the Government.

The Ures, and others who suffered direct damage from the invasion of their lands by the rush of waters from the break, claim that, as a result of the waters' escaping from the canal, their lands were flooded and a certain portion was washed away and other portions rendered unusable by deposit of sand, rocks and debris, and that the resulting trough separates one portion of the land from the other. Injuries to structures on the land are also claimed. Although other forms of the basic contention are presented, there is one statement of claim in the pretrial order which is entirely comprehensive. It is said that "because the defendant retained exclusive control and management of the project and all its facilities, it was the duty of the defendant to protect the plaintiffs from the flooding." The land where the break occurred was vested in the United States. The fact that the lower side of the ditch was without lateral support, because the terrain sloped off to a marked degree, is set up. It is claimed that the ditch had a capacity of 451 second feet of water, and that there were 450 second feet being carried at the time of the first break. It is also indicated that this column of water was flowing for a distance of 36.15 miles down to and through the break.

■ The United States contends, first, that the landowners were not parties to the contract between the Irrigation District and the Government, and, as a result, no duty was owed to them. Disposition of this may be made shortly. Sheff White and Ure accepted the burdens of the contract in accordance with a direct provision therein. According to a proviso thereof, the land could not have obtained water unless the District assessments were paid and unless the contract between the Government and the District were accepted by the landowners. It might thus be indicated that the action was on a contractual lia-

bility and therefore could be brought under the Tucker Act. Another phase of the contention of the Government is that, since there was no contractual liability to the Whites, there was no duty owed to them under the contract, and therefore a tort claim for the damage was not maintainable. The argument just above stated also applies to this contention. But neither of these two points need be decided. It makes no difference whether the Whites could sue on the contract or not, either in tort or contract. The Tort Claims Act provides that there shall be a remedy "for injury or loss of property * * * caused by the negligent or wrongful act or omission of any employee of the Government * * * under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[1] Under the law of Oregon, by assuming the operation and maintenance of the canal, the Government became a common carrier of water. It thereby incurred the duty to use reasonable care to effect delivery to the Whites of the amount of water called for by the water right which was a real appurtenance to their land. And, since this is all that the plaintiff asks of the Government, whether on the theory of contract, tort based on contract or as a result of the duty established by the laws of the state upon one assuming to act as a common carrier of water to lands to which the water right is appurtenant, the same basis for recovery is laid. The Government attorneys contend that, in the construction, maintenance and operation of the canal, there was exercised "a strictly discretionary governmental function of the highest character," and therefore that the Government is specifically exempt under the provisions of the Federal Tort Claims Act, 28 U.S.C.A. § 2680(a). The Court is of opinion that this argument is entirely unsound. The Government, in order to collect back the money which it had spent upon the construction of the work and the canal and the operation thereof through an easement

I. 28 U.S.C.A. § 1346(b).

which it owned, assumed the management and control of the column of water and the duty to deliver. If it were necessary to so decide, it might be held that this was in a proprietary capacity, but, whether or not that be true, the words of exemption in the Act do not apply to such duties as these. It is also contended that, in selecting the course of the canal, the Government agents had no alternative but to construct it over the type of soil upon which it is located, and had to exercise its discretion as to whether it should construct the canal over the character of soil on which it was constructed or to refrain from constructing it entirely.

The gist of the charge of negligence, however, is that it maintained and operated the canal at a full head knowing the character of soil upon which it was built without lining it with concrete, impervious soil or constructing an impervius core on the lower bank, which was required originally by the plans.

The question of whether ordinary care was exercised by the officers, agents and employees of the Government in the construction, operation and maintenance of the irrigation works, in view of the duty to deliver water to the Whites, comes up for decision. The plaintiffs' charges of negligence are now examined.

There was the theory of the plaintiffs that there was some sort of a reservoir in the soft materials of the hill, which backed up the water and held it until the time when it had permeated the whole structure. It is contended this is a serious defect in construction. The Court is inclined to believe from the evidence that the experts called by the Government are more nearly exact and that the explanation is that the structure was below the bottom of the canal. However that may be, it is unquestionable that the defect could have been avoided by lining the canal with concrete at the particular point, building an inner core or a like structure upon the side and bottom of the canal, and finally by digging out the soft structure and permitting the canal to be lined with impervious material. Since the defect in the structure was not discovered at the time of construction, no such measures were taken. However, there is no doubt from the testimony which is now in the record that the defect could have been discovered, had proper tests been taken at the time of construction or afterwards. Competent engineers, however, must admit that the mere fact that these structures, which would not hold water, were buried four to six feet beneath the canal and over a space of two hundred to three hundred feet along the center line could have been discovered with proper test at the time of construction.

■ However, plaintiffs here had the burden of proof. A careful reexamination of the evidence shows that the cause of the break was never established and remains conjectural. Another charge is that of failure to provide competent inspection. In this connection, there is no doubt that inspection was provided, but the character of the inspection must be examined.

In the light of the standard of ordinary care, the Court will examine these charges of negligence. If this break had occurred within a few months after the construction of the canal, ordinary care would have required the discovery of the pervious structure, upon the latent existence of which the Government now bases its defense. The essential negligence would have been the release of a full head of water before inspection to insure stability in the canal. If a simple device of building a core would have prevented the disaster, this necessity seems too plain for argument. Likewise, if a break would not have occurred had the canal been lined at this point with concrete, as it is in some other sections, efficient inspection would have disclosed the necessity. As for the idea that the defect was hidden does not comport with the respect which the Court has for the engineering profession to hold that such a situation, now hypothetically assumed, could not have been discovered and proper precautions taken against a break by thorough inspection during construction.

■ The Court was not convinced that the attempted explanation of the government experts was valid. It was unquestionably proved that there were structures near

the canal at the points which were pervious to water, and that these were saturated at the time of the breaks. But the evidence did not disclose why or how the break happened eleven years after construction. Since the burden of proof lay on plaintiffs to establish cause and damage as a proximate result, no liability can be found in this state of the record. In view of the nature of the duty to deliver water, res ipsa loquitur does not apply.

■ A great quantity of water has flown over the dam and through the Owyhee Canal since construction. The Court is of opinion that the canal itself built up a protective covering over these structures, which was only gradually permeated by water. We hold that eleven years of use of this canal would lead persons charged with only the duty of ordinary care to believe that the construction was proper and that the canal would hold a full head of water over irrigation season in the absence of other circumstances tending to destroy that belief. After all, the charge can not be negligence in construction alone, but must be coupled with a charge of negligence of operation under all the circumstances, with the duty imposed as to the irrigators below. The Court believes the operation of the canal at full head at a time when everyone was crying for water was in the exercise of ordinary care. Now we turn to other circumstances from which warning of the impending break might have been obtained.

This question is whether warning should have been taken from the condition of the ground about the canal and below and about the place where the break occurred. Also, there is a question whether the springs or outlets below were of such nature as to indicate to reasonably prudent persons using ordinary care that the canal was about to break. A great deal of testimony was taken concerning the condition of the fields and ditches close to the embankment of the canal, near the point where the break subsequently occurred. This latter testimony, in the opinion of the Court, was quite weak. The Court was not convinced that any observed conditions referred to did not come from surface water. Nor is great weight to be given testimony concerning the miring of a tractor and a wet condition of soil in the field immediately below the place where the break subsequently happened. The water in the lateral of the farm within a few feet from the toe of the canal bank was, in our opinion, casual. It was either surface water or rain. As a matter of fact, at the time that this water showed up, the canal had no water in it, since the stream had not yet been required for irrigation. There is also some testimony as to heavy growth of willows and other brush near this lateral canal. The brush is much more likely to have received moisture from the lateral itself. Experience in the irrigation country does not indicate that such circumstances would be taken as indications that a break was going to occur in the main canal.

There is considerable testimony about the appearance of flowing springs below the wall of the canal. The evidence is that from certain of these springs there was a continuous flow of considerable strength. These emanations of water were at a great distance from the canal. Besides this, the statement that the canal must have some outflows might well be true. The opinion of the experts seems to accord the experience of the irrigation country that the suspiration of a canal is apt to denote a healthy condition. Certainly, these springs were well known to the whole countryside, and, if anyone had believed that they were a source of peril, the matter would have been taken up in protest by the landowners on whose property these appeared and other irrigators who depended on the canal for their crops.

■ As a matter of fact, we have very strong indication here that there were no circumstances such as would have warned a person in the exercise of ordinary care. The farmers themselves, in an irrigation country, are concerned with the maintenance of the main canal, and, if there were any such circumstances which would call attention to the ordinary man the fact that the canal was apt to break, they unquestionably would have been reported to the Government and we would have had testimony that such warnings were given.

There is no such testimony in the record. There was nothing then in any of these conditions which would require a person, in the exercise of ordinary care, to anticipate a break because of the circumstances mentioned. The Court holds that the absence of ordinary care in this respect has not been demonstrated by this showing.

The next question is as to the competency of the inspection. It is not contended that there was no inspection. This, of course, would have been contrary to fact. There was positive evidence that inspection was carried on regularly twice a day, and that within one-half hour of the break the inspector passed over the road on the bank of the canal and saw nothing which would lead him to believe that a break was imminent. This is shown to have been the usual custom of the Government in regard to inspection. It was unquestionably adequate to fulfill the duty of exercise of ordinary care. It might be contended that the inspector employed was not competent, but there has been no attack upon that basis. The only question involved is whether it was sufficient to have a person ordinarily skilled in irrigation problems to make such inspection or whether it was necessary to have an inspection by a competent engineer who would make appropriate tests. In view of the nature of the duties, however, the Court determines that the inspection made was sufficient. If it had been that the inspector had noticed any suspicious circumstances and disregarded them, thereupon an entirely different problem would have been raised, but in this instance there is no such showing. Therefore, as far as the inspection is concerned, the Court holds that it met the duty incumbent upon the Government to use ordinary care in attempting to maintain the canal and control the column of water.

As to the plaintiffs who complain of loss of crops, therefore, the Court concludes that, as to the first break, there is no responsibility on the Government.

It is then said that the second break was caused by negligence in failing to discover that the structure, which permitted the first break, extended a considerable distance down the canal, as above noted, and that it would not hold water until all of this structure had been scraped out of the bottom and different earth built in. And secondly, that a full head of water was turned in, in the first instance, and that the break resulted from that, whereas, if it had been allowed to build up gradually, the catastrophe would not have happened. There is much less to support this charge than there is to support the charges as to the first break. The record shows that those engaged in fixing the first break took prompt and efficient methods to rebuild the canal at the point where the break had taken place. At that time, no one knew of the weaknesses of the structure or what caused the difficulty. It was only after the second break that the phenomenon, which unquestionably caused both breaks, was discovered. It must be remembered that the action of those repairing the break was action in emergency. The farmers were complaining of the lack of water and of the fact that the first break had occurred. It was imperative to get the water to the irrigators as soon as possible, in order that the crops should not be destroyed. This review is sufficient to clear away both the failure to discover the character of material which caused the first break and the use of a full head of water. The causes which depend upon failure to deliver water must therefore be dismissed.

The whole aspect of the problem changes when the cases of direct damage by flooding are considered. Here the United States built and controlled a canal capable of carrying a volume of water far beyond the normal capacities of the local streams, under tremendous pressure, by virtue of the planned fall of the ditch. This construction further carried water high above the natural stream beds along the rimrock of the dusty hills. It is shown how the flow was carried by soil stuctures inept for such burden in this particular place. The United States, for its own purposes, retained complete direction and control of this artificial current. By its agents, the flow was wilfully directed through these structures, and the speed and volume of the column of water was built up, modulated or cut off

completely. The parcels of realty of which Ure and others were seized geographically are lower and in positions exposed to the devastating rush of water if a break were to occur. These elements were obvious and the risk deliberately accepted by construction and especially by operation. The duty to protect rose with the danger.

It seems reasonable, under the circumstances, to impose a much higher duty upon the carrier of water for hire for injury to tenements endangered by the element so devastating when unchained from an elevated position. Methods of imposition of consequences for violations of the duty of governing such an elemental force are various.

There are several methods of approach, both technically and realistically, to the problem of imposition of liability in regard to the casting of a stream of water from higher land upon land of another at a lower level. The first is the absolute liability imposed for such where one controls a dangerous force which escapes and does injury upon nearby lands. The second is the liability where one voluntarily sets in motion a physical body which actually invades or, as the old books say, commits a trespass upon lands of another. The third is the rule that one dealing with a potentially dangerous instrumentality is bound to use the highest degree of care.

The famous decision of Rylands v. Fletcher [2] imposed absolute liability upon one who introduced water on his own land, where the element escaped onto the land of his neighbor. This opinion has caused extended controversy in this country.[3] The weight of authority is against its application in most jurisdictions of this country.[4] This is explained on the ground of rejection of an anachronistic doctrine inapplicable to present conditions.[5] It is doubtful that the decisions can be so explained.[6] The American Law Institute has adopted a caveat.[7] A great many jurisdictions still apply this doctrine, and there are some decisions squarely in point under the facts here.[8] There is a great deal of confusion in the American authorities. The supposed doctrine is repudiated or upheld in widely different situations.[9] It is debated in cases involving waters percolating because of a dam [10] or an irrigation ditch,[11] slight overflows from a canal,[12] flooding of land by

2. L.R. 1 Ex.Ch. 265, affirmed; Fletcher v. Rylands (1868), L.R. 3 H.L. 330.

3. Bohlen, Studies in the Law of Torts (1926), p. 344; Pound, An Introduction to the Philosophy of Law (1922), p. 183.

4. Note, 169 A.L.R. 517.

5. Bohlen, Studies in the Law of Torts (1926), p. 352.

6. Pound, Interpretations of Legal History (1923), p. 106.

7. See note, Restatement of Torts, Ch. 21, § 520.

8. Bridgeman-Russell Company v. City of Duluth, 158 Minn. 509, 511, 197 N.W. 971, 972: "The trend of modern legislation is to relieve the individual from the mischance of business or industry without regard to its being caused by negligence. Our safety appliance acts and workmen's compensation acts are examples. And even in states where Rylands v. Fletcher has been rejected, trespass may be maintained to recover damages for similar invasions of property from other substances than water, and, of course, without proof of negligence. Hay v. Cohoes Co., 2 N.Y. 159, 51 Am. Dec. 279; Wheeler v. Norton, 92 App. Div. 368, 86 N.Y.S. 1095; Mairs v. Manhattan, 89 N.Y. 498; Sullivan v. Dunham, 161 N.Y. 290, 55 N.E. 923, 47 L.R.A. 715, 76 Am.St.Rep. 274. The complaint in the case at bar charges trespass also, but, from the conclusion already reached that the rule of Rylands v. Fletcher should not be disturbed, it is not necessary to place an affirmance of the order upon the ground that a good cause of action for trespass is pleaded."

9. Jacoby v. Town of the City of Gillette, 62 Wyo. 487, 174 P.2d 505, 177 P.2d 204, 169 A.L.R. 502, and note, 169 A.L.R. 517; Healey v. Citizens' Gas & Electric Co., 199 Iowa 82, 201 N.W. 118, 38 A.L.R. 1226, and note, 38 A.L.R. 1244.

10. Healey v. Citizens' Gas & Electric Company, 199 Iowa 82, 201 N.W. 118.

11. North Sterling Irr. Dist. v. Dickman, 59 Colo. 169, 149 P. 97, Ann.Cas.1916D, 973.

12. Jacoby v. Town of the City of Gillette, 52 Wyo. 487, 174 P.2d 505, 177 P.2d 204.

backing of water,[13] release of water in minor quantities through waste ditch [14] and other situations.[15] All these must be distinguished from the violent breach of a reservoir by this elemental force stored by the act of a party. Where one is managing a stream of water and loses control, whereby the element rages over the land of another, the cases above mentioned have no applicability. This distinction has been little noted in the opinions.

Closely allied to this doctrine is the liability imposed where one, either personally or by agency of some force which he voluntarily sets in motion, trespasses upon the land of another. At common law, with certain minor exceptions not important here, any interference with possession is an act which will entitle the injured party to bring an action in tort. The fact that the act is done accidentally or in good faith or under justifiable error is no defense.[16]

The most striking illustration of this doctrine in modern law is found in cases where a trespass is committed on land by virtue of an invasion thereof by falling rocks, earth or other substances occasioned by the voluntary setting off of a blast of dynamite or other explosive.[17] Here the rule of absolute liability is applied because the defendant voluntarily unleashed a force which, contrary to his intention, invaded the lands of another. In these instances, the overwhelming weight of authority [18] is that there is no defense even though the most extreme precautions were used. If the substances had been stored by the owner of adjoining land and had exploded without the owner's intention or knowledge, then the doctrine of the Rylands case would apply. The analogy between the blasting cases and the stored water cases is indicated in a very interesting opinion of the Court of Appeals of the Second Circuit.[19] The Court there say: "While the rule laid down by Blackburn, J., in Rylands v. Fletcher, * * * has not been followed in America to the full extent of all its implications, and, at the outset its authority was impaired by Brown v. Collins, 53 N.H. 442, 16 Am.Rep. 372, Marshall v. Welwood, 38 N.J.Law, 339, 20 Am.Rep. 394, and Losee v. Buchanan, 51 N.Y. 476, 10 Am.Rep. 623, yet in the so-called 'blasting' cases an absolute liability, without regard to fault, has uniformly been imposed by the American courts wherever there has been an actual invasion of property by rocks or debris."

The blasting cases have one element which is not present in the stored water cases, but is present in the instant case. When one voluntarily and deliberately does an act upon his own land which results in a physical trespass upon lands in other ownership, the liability is absolute. In the stored water cases, a condition has been created, the consequences of which may be injury to other land. But in the active release and management of a column of water flowing at a fast rate and in great volume, as in setting off a blast, the person who initiates and carries on the activity is a participant in whatever results. If the result is a trespass on lands of another, the liability is absolute.

This is not an isolated instance of the doctrine that, where one voluntarily does an act which results in trespass upon land of another, he is absolutely liable. There are opinions which hold that water cast upon another's land, as a result of some act voluntarily done by another, constitutes a

13. Wilson v. City of New Bedford, 108 Mass. 261, 11 Am.Rep. 352 (condemnation).

14. Parker v. Larsen, 86 Cal. 236, 24 P. 989, 21 Am.St.Rep. 30.

15. Cahill v. Eastman, 18 Minn. 324, 18 Gil. 292, 10 Am.Rep. 184; Texas & Pacific Railway Company v. O'Mahoney, 24 Tex.Civ.App. 631, 60 S.W. 902; note, 15 L.R.A.,N.S., 541.

16. Holdsworth viii, 465, also 466-7, iii, 377-8-382, xii, 523-4.

17. Sullivan, Adm'x v. Dunham, 161 N.Y. 290, 55 N.E. 923, 47 L.R.A. 715, 76 Am. St.Rep. 274.

18. Note, 35 A.L.R. 1244.

19. Exner v. Sherman Power Construction Co., 2 Cir., 54 F.2d 510, 513.

trespass,[20] whether intentional or not,[21] and this rule is applicable to acts done by governmental bodies.[22]

Due to changing fashions of pleading, the ground of trespass is rarely chosen alone at the present time. The pleader usually thinks that he is safer to place the matter upon a ground of negligence. The Courts, however, in applying the doctrines of negligence, recognize the difference between an inherently dangerous situation and one that will result in a trespass, as differentiated from the ordinary course of events which requires only ordinary care. There are no degrees of negligence, but there are degrees of care. Where a situation has potential elements of extreme hazard, the Courts require a high degree of care and sometimes what they term the "highest degree of care," which does not render the party under such a duty an insurer, but requires him to have in contemplation the perilous potential results of his acts. A procedural corollary of this rule is that the person who is in the exclusive management and control of such a dangerous instrumentality is liable on mere proof of damage occurring as a result of the operation thereof, unless perchance he can establish the injury was caused by Act of God, by the act of a third person or by act of the plaintiff himself. This technical device for fixing liability is commonly called res ipsa loquitur. The operation of the rule and its corollary obviously has the same effect as the application of the rule of absolute liability. The dress is more modern, but the body is the same.

The doctrine of res ipsa loquitur, in conjunction with a higher degree of care, has been applied in the case of falling objects, handling of electricity,[23] occurrences as a result of defects in or mishandling of machinery, common carriers of passengers,[24] fires and explosions and particularly from escaping water.[25]

This critique of theories is of no value except to clear the ground. Congress, by the pertinent act, has consented that the sovereign be liable only where an individual would be under the law of the particular state under the particular circumstances. There is no direct decision of the Supreme Court of Oregon, which establishes liability upon a private citizen under the exact fact. That tribunal has never directly dealt with a violent break in the large irrigation canal whereby the water did damage to lands in a lower position. But the opinions of that Court are not the entire orb of the law. The apothegm of the common law was that the law existed covering every possible concatenation of events, and that the applicable rule could be discovered by research and then declared. The ultra-modern stopgap, which replaces this barrier of antiquity, is pragmatic. Present day federal courts are bound by necessity to speculate upon what the judges of the particular state would do if confronted with the exact facts then presented for decision.

Article XVIII, provision 7, of the Constitution of the State of Oregon and the Act of June 27, 1844, together constitute a declaration that the common law of England shall constitute a part of the law of Oregon, unless the common law doctrines were modified by the enactment of pertinent statutes.[26] The legislature of the State of

20. Cartwright v. Southern Pacific Co., D.C.Or., 206 F. 234, 235; See Fortier v. H. P. Hood & Sons, Inc., 307 Mass. 292, 30 N.E.2d 253; Ryder v. Town of Lexington, 303 Mass. 281, 21 N.E.2d 382; Dryden v. Peru Bottom Drainage Dist., 99 Neb. 837, 158 N.W. 55; City of Jackson v. Wilson, 146 Ga. 250, 91 S.E. 63. The Oregon Supreme Court adopts the trespass rule in regard to water cast on another's land. Laurance v. Tucker, 160 Or. 474, 85 P.2d 374; Boulevard Drainage System v. Gordon, 91 Or. 240, 177 P. 956, 178 P. 796.

21. Hueston v. Mississippi & R. R. Boom Co., 76 Minn. 251, 79 N.W. 92.

22. Dryden v. Peru Bottom Drainage Dist., 99 Neb. 837, 158 N.W. 55; Kiefer v. County of Ramsey, 140 Minn. 143, 167 N.W. 362; But see Westerson v. State, 207 Minn. 412, 291 N.W. 900.

23. Boyd v. Portland Electric Co., 41 Or. 336, 68 P. 810.

24. Budd v. United Carriage Co., 25 Or. 314, 35 P. 660, 27 L.R.A. 279.

25. Kahn v. Triest-Rosenberg Cap Company, 139 Cal. 340, 73 P. 164.

26. Lytle v. Hulen, 128 Or. 483, 275 P. 45, 114 A.L.R. 587.

Oregon has enacted a statute which reads as follows:

"Every corporation constructing a ditch or canal, flume or reservoir, under the provisions of this act shall be liable for all damages done to the persons or property of others, arising from leakage or overflow of water therefrom growing out of want of strength in the banks or walls, or negligence or want of care in the management of said ditch or canal, flume, or reservoir; provided, that damage resulting from extraordinary and unforeseen action of the elements, or attributable in whole or in part to the wrongful interference of another with said ditch or canal, flume, or reservoir, which may not be known to said corporation for such length of time as would enable it by the exercise of reasonable efforts to remedy the same, shall not be recovered against said corporation." Laws of Oregon 1891, page 57, § 16, O.C.L.A. § 116-408.

"Every corporation constructing a ditch or canal or flume under the provisions of this act shall carefully keep and maintain the embankments and walls thereof, and of any reservoir constructed to be used in conjunction therewith, so as to prevent the water from wasting and from flooding or damaging the premises of others; and it shall not divert at any time any water for which it has not actual use or demand." Laws of Oregon 1891, page 58, § 18, O.C.L.A. § 116-409.

It is contended that these paragraphs bind the United States as a "corporation constructing a * * * canal * * * under the provisions of this act." Although other courts have adopted far-reaching constructions in order to accomplish what were believed to be desired ends, the reasoning thereof is not persuasive.[27] The United States was not within the scope of the intention of the legislature. However, this enactment contains a clear recognition of the common law principles relating to responsibility for the maintenance of a canal or ditch used by a carrier of water.

The common law principles were therefore not modified by statute but exist today for the governments not only of the corporations organized under that Act but also for all other purposes in a like situation.

The rule relating to private parties in the State of Oregon is the pole star here. A review of the various theories of liability, as noticed by the Supreme Court of Oregon, will therefore be helpful. That tribunal has from an early period of its history given definite approval to the doctrine of the Rylands case in a series of decisions. So emphatic has such approval been that Oregon is usually noted in the texts, law review articles and compilations as one of the states accepting that doctrine. It is to be noted that there is probably no opinion in which that court squarely applied the principle. In Esson v. Wattier, 25 Or. 7, 34 P. 756, the court refused an injunction against the construction of the dam, which it was claimed would cause water to seep upon the premises of plaintiff. Such an injury the court held would be within the rationale of the Rylands case, which is cited and quoted. In Mallett v. Taylor, 78 Or. 208, 152 P. 873, which was also an injunction case against percolation and minor overflow from an irrigation ditch, the injunction was granted. The court there cited the Esson case and cited and quoted the Rylands case. Mr. Justice McBride, speaking for the court, quoted from the laws of Hammurabi as follows: " 'If a man neglect to strengthen his dyke and do not strengthen it, and a break be made in his dyke and the water carry away the farm land, the man in whose dyke the break has been made shall restore the grain which he has damaged. If he be not able to restore the grain, they shall sell him and his goods and the farmers whose grain the water has carried away shall share in the results of the sale': Harper's Code of Hammurabi, §§ 53, 54." [78 Or. 208, 152 P. 875]

He also comments: "If we eliminate the severe 'proceedings supplemental to execu-

---

27. Hulbert v. Twin Falls County, 327 U. S. 103, 66 S.Ct. 96, 90 L.Ed. 417, reversing Twin Falls County v. Hulbert, 66 Idaho 128, 156 P.2d 319, which held that a sovereign state was not bound by indefinite language in a federal controlled statute.

tion,' the law is practically the same to-day as it was in the year 2250 B. C."

The court, however, found in this case that there was proof of negligence and therefore granted an injunction. In Patterson v. Horsefly Irrigation District, 157 Or. 1, 69 P.2d 282, 290, 70 P.2d 36, the court held that instructions in a seepage case, which the court interpreted as making an irrigation district "and all its directors insurers against damage of any and every nature resulting from construction, operation, or maintenance" of the system without regard to negligence, were erroneous.[28] This case, of course, cannot be assumed to set aside the approval given to the Rylands case in previous opinions. Mr. Justice Bailey, who wrote this opinion, also wrote the opinion in the case of Suko v. Northwestern Ice & Cold Storage Co., 166 Or. 557, 113 P.2d 209, wherein damage was claimed on account of the breaking of an elevated tank used for storing water by a lessee, whereby adjoining premises were invaded by its collapse, and personal injuries resulted. There the court cites Esson v. Wattier, Mallett v. Taylor and Rylands v. Fletcher. Although that case is finally also decided upon principles of the highest degree of care and the application of res ipsa loquitur.

The doctrine which imposes strict liability in case of trespass has been adopted and followed in the State of Oregon. Where defendant exploded a large blast of powder, throwing debris all over the residence of the plaintiff, it was indicated that there was liability because the plaintiff was frightened and fainted as a result thereof. Salmi v. Columbia & N. R. R. Co., 75 Or. 200, 146 P. 819, L.R.A.1915D, 834. It has also been held that, where there was a flood of a stream, a corporation maintaining a dam could not suddenly release large quantities of water in addition to the flood water from its dam and, if property lower down on the stream were thus inundated, the corporation would be liable. Crawford v. Cobbs & Mitchell Co., 121 Or. 628, 253 P. 3, 257 P. 16. It will thus be seen that the Oregon court recognizes the forms of liability which follow from the adoption of a common law in the Constitution of the state.

In any event, the decisions of the Supreme Court of Oregon, with regard to water, have generally dealt with percolation, infiltration or minor overlapping of the canal bank. As noted above, there has been no case where recovery has been sought for a major breach in the bank of a large canal. As a result of this and the tendency upon the part of lawyers modernly to use negligence as the basis for liability in all cases, this doctrine has usually been made the basis for recovery. In Enison v. Owyhee Ditch Co., 37 Or. 577, 62 P. 13, it was held that it was improper to instruct that, if plaintiff cast water on her own land, that was contributory negligence to the act of the defendant, whereby water from defendant's ditch overflowed her premises. It is obvious that the action should have been for trespass, then the problem would not have arisen.

In Taylor v. Farmers Irrigation Co., 82 Or. 701, 162 P. 973, there was complaint for injunction to seepage from an irrigation canal. The trial court held that the "ditch or canal was properly constructed and had been kept in good repair, and that the water flowing therein did not seep or escape on plaintiff's premises." The evidence showed none, and the case might have been decided on this basis. However, the court holds negligence must have been shown. In a series of percolation or minor overlapping cases, the court has followed that principle.[29] In the case which is most like the facts in the case at bar, as noted above,[30] the Oregon Supreme Court applied a negligence rule of a very drastic charac-

---

28. Hon. Arthur Hay, now an Associate Justice of the Oregon Supreme Court, was the trial judge. The instructions laid down the correct rule in accordance with previous Oregon cases, but were somewhat ambiguous.

29. Mallett v. Taylor, 78 Or. 208, 152 P. 873; Patterson v. Horsefly Irrigation District, 157 Or. 1, 69 P.2d 282, 70 P. 2d 36; Kaylor v. Recla, 160 Or. 254, 84 P.2d 495.

30. Suko v. Northwestern Ice Co., 166 Or. 557, 113 P.2d 209, supra.

ter. There, as noted above, an elevated water tank on premises in exclusive possession and control of a lessee, burst and injured plaintiff in a house on adjoining property. 3 Kinney on Irrigation and Water Rights; 2d Ed., § 1669, page 3069, was quoted as follows: "Water, at times, is a most dangerous element even flowing in its natural condition, without the influence of man; and, when formally restrained by the works of man, it suddenly breaks through its barriers and tears through the lands below to the great destruction of life and property, it becomes even more dangerous. Therefore, in a previous section of this work, we stated to the effect that it is the duty of all irrigation or water companies, especially in the construction of dams and reservoirs for the storage or the holding back of great quantities of water, to so construct them that they will be of such a strength as to withstand all pressure of water on both ordinary and extraordinary occasions, so far as skilled human foresight can determine, and with that reasonable degree of care as is commensurate with the nature and magnitude of the undertaking, in order to protect the lives and property of those below." Rylands v. Fletcher, supra, and the Oregon decisions following the doctrine are cited. The duty of one bringing water upon premises under his exclusive control, say the court, and storing it in an elevated position, was proportionate to the injury which might result if it escaped. The doctrine of res ipsa loquitur was applicable, the court decided, because negligence was proved by the bursting of the tank. Since a high degree of danger calls for a very high degree of care, inspection by untrained persons was no defense, but that the examination by a highly trained tank expert might be required.

 This Court holds that the Oregon Supreme Court, if faced with the exact facts here, would apply the rule of absolute liability.

Since the pretrial order is sufficiently broad in the questions propounded to cover any and all of these theories of liability mentioned in the opinion, we need not determine whether application is made of the absolute responsibility of the manager of an elemental force or because of a trespass quare clausum fregit or because of the theory of an action on the case for negligence, reinforced by the necessity of explaining how structures erected by defendant and under its control happened to break when subjected only to normal tensions and strains, which these were built to withstand.

 The evidence would clearly bring this case in the purview of the Rylands case. Here there was a stream of water —36 miles long—flowing 450 second feet of water in an earthen canal through a structure which was incapable of holding the force thereof. Defendant not only brought the water into an elevated position above the lands of plaintiff, but continued to have it flow there, although no sufficient guard was placed to prevent the water from flowing onto the lands of plaintiff. If then this doctrine, so often quoted with approval by the Supreme Court of Oregon, were applied, plaintiff should recover.

The defendant voluntarily, for the purpose of reimbursing itself for outlay, assumed the control of this elemental force, which was a stream 36 miles long, flowing rapidly and carrying 450 second feet of water. The water invaded the lands of plaintiff and did damage as a consequence of the voluntary act of defendant in turning the water into the canal above. This is a trespass for which liability follows at common law and under the Oregon decisions.

The defendant was handling a highly dangerous instrumentality in a position where the lands of plaintiffs were peculiarly exposed to peril, and was bound to exercise a degree of care proportionate to the injuries likely to result to others if the ditch did not hold the stream. When plaintiffs proved the collapse of the wall of the canal and the injuries suffered by him, he made out a prima facie case of negligence. "A very high degree of danger calls for a very high degree of care, which, however, amounts to no more than ordinary care in

such a case."[31] The defendant, knowing the structures over which this canal was built at this point, was bound to make detailed engineering inspections from time to time while the canal was carrying a heavy load of water. There was no proper care taken, and the liability would be found by the Oregon courts in a case between private citizens.

Even though one may receive water which gives life to his land through the same ditch which is the origin of his disaster, it cannot be conceived why he should bear the full onus thereof while his fellow landowners, whose prosperity is based upon the same operation, and the carrier who transported the water for hire should go scot free. To make this concrete, there is no reason why Fine Sheep Company or Ure should assume the entire burden of damage to his property because of the escape of this raging stream of water. The stream was introduced to aid in the building of the prosperity of the community and in the reclamation of the desert, but there is no circumstance which appeals to this Court which dictates that a private individual bear the loss instead of the person or corporation who volunteered for consideration to carry water to the whole project. If a corporation were so carrying the water, it would be liable under the statute, which simply crystallizes the common law. A private person would be held upon the common law doctrine of trespass and upon the public policy which underlies the statute and the decisions of the Oregon Supreme Court. Under these circumstances, there is no reason why the United States should not be liable under the enactment subjecting the Government to tort liability.

██ Since this determination of what the law of Oregon is has been made the only defense of the Government, this will be dealt with. The exclusionary clauses of the Act do not cover this case. This is not a discretionary function. The matter of planning and construction of an irrigation canal can be the subject of failure to exercise a higher degree of care upon the part of the servants of the Government, as well as the servants of a private corporation. The contractual liability of the Irrigation District to the United States is not decided at this time.

There is one suggestion made upon argument which must be rejected with scorn. It is said that, if the Government is held to responsibility for breaks in the canals and dams which it has constructed, it will effectually dampen the ardor of the bureaus for constructing other works. This suggestion is amoral at least.

The determination of the Court is that the Government is liable in the flooding cases. These cases will therefore be set for trial in order to fix the damage as to each tract involved.

---

31. Suko v. Northwestern Ice & Cold Storage Co., supra, 166 Or. at page 571, 113 P.2d 209, 215.