**UNION PACIFIC RAILROAD COMPANY, a corporation, Plaintiff,**

v.

**VALE, OREGON IRRIGATION DISTRICT, a quasi-municipal corporation, Defendant.**

**Civ. No. 63–399.**

United States District Court
D. Oregon.

March 28, 1966.

202 F.Supp. 313 (S.D.N.Y.1962) both decided by Judge Frederick van Pelt Bryan,

Walter J. Cosgrave and L. James Bergmann, of Maguire, Shields, Morrison, Bailey & Kester, Portland, Or., for plaintiff.

Robert D. Lytle, Vale, Or., for defendant.

KILKENNY, District Judge:

Plaintiff's first, second and third claims arise out of damage to plaintiff's railroad right-of-way and tracks on plaintiff's Oregon Eastern Branch (Vale to Burns, Oregon), allegedly resulting from water escaping from defendant's irrigation canal located on a hillside above plaintiff's right-of-way. The first and second claims demand money damages, while the third claim seeks equitable relief against continuing trespasses.

The fourth and fifth claims are for damage to plaintiff's railroad right-of-way and tracks between railroad mileposts 3 and 4 on its Brogan Branch (Vale to Brogan, Oregon), a section of which was damaged by a quantity of water from defendant's nearby irrigation canal, which burst while carrying a large volume of water.

Plaintiff is a common carrier of persons and property by railroad in interstate and intrastate commerce, and was engaged in operating a railroad system consisting of the lines of railroad above mentioned and others located in the state of Oregon and in other states of the United States.

Defendant is an irrigation district, a quasi-municipal corporation, organized under the laws of the state of Oregon for the purpose of operating and maintaining an irrigation district and delivering water through irrigation canals to the lands located within the boundaries of the district. In particular, the object of the business of the defendant was to store, and during the irrigation season to transport and deliver on a proportional basis, certain water to lands within its boundaries. The irrigation canals involved in the controversy are part of an irrigation system known as the "Vale Project" constructed by the United States of America for the benefit of defendant, pursuant to contract made in 1926. The physical works of the project, including the irrigation canals involved in this controversy, were transferred to and accepted by defendant for operation and maintenance purposes only in January, 1949. Under the terms of the contract, the defendant is required to promptly repair and properly care for, operate and maintain the transferred works, all without cost to the United States. The title to the transferred works remained in the Government. The irrigation system serves 32,000 acres of land, of which approximately 28,254 acres are served through the canal located high above the railroad track of plaintiff at the points here being considered. The application of water through the process of irrigation is a necessity in order to produce crops of an economic value in this part of the state of Oregon.

CLAIMS ONE, TWO AND THREE

At a point between railroad mileposts 37 and 38 on the Oregon Eastern Branch, the said railroad track was, and is, located on the northerly side of the Malheur River, approximately parallel to the course of that river. Located to the north of said track is a steep hill rising from the river level. The track was, and is, located in the narrow area between the foot of said slope and the river. Located close to the brow of the hill above the track is the defendant's canal which was, and is, operated and maintained by defendant for use in conveying irrigation water. The railroad track existed in said location for a great many years before the construction of the canal. At the point in question, on or about August 20, 1961, a sliding and heaving action occurred in the soil adjacent to and underneath the plaintiff's track. The plaintiff was compelled to relocate and construct a new road bed and track at said point, for a distance of approximately 870 feet, so as to curve outward away from the base of the slope. Additionally, the plaintiff replaced the culverts under said track, in all of which plaintiff incurred substantial expense. The evidence is uncontradicted that defendant's canal was located on the hillside, high above the right-of-way and track of the plaintiff, between said posts where the slide occurred. At the point above the slide,

the canal is approximately 40 feet in width. The line portion is 34 feet wide from the top of the lining on the hillside to the top of the lining on the river side. At this point, it is 7 or 8 feet deep. The water is diverted from the Malheur River, some 16 miles upstream, and although the exact flow at the slide area is not shown in the record, there is no doubt but that it was rapid. During the months of May, June and July, 1961, in excess of 83,000 acre-feet of water was diverted into the canal, with an estimated loss of 10% by the time it reached the slide area; leaving approximately 75,000 acre-feet flowing past the point under scrutiny. One of the experts testified that at times "there would be three times as much water in the canal as there would be in the Malheur River below". In analyzing the testimony and the relative positions of the parties, we must keep in mind that the railroad track was constructed in 1911 or 1912, and that the canal was not constructed until 1929.* Aside from the fact that the canal was constructed close to the brow of the hill is the further fact that the hill below the canal is very steep. The soil at that point was so unstable at the time of construction that an engineer working for the Bureau of Reclamation, in his report said, "At the time of canal construction the slope was barely stable and any disturbance could have triggered new earth movement." A ground water geologist called by the defendant stated in his report that the slope at the point of the slide was "an ideal description of a potential landslide area," while another described it as a "critical slope."

In my mind, there is no doubt but that large and destructive quantities of water escaped from the canal at or about the point of the slide. Even defendant's witnesses conceded that there was an escape of water at the point. The only detailed engineering study made in connection with the slide covering a period of approximately two years convinces me beyond question that the great volume of water in the canal and the escape of a portion, rather than normal rainfall, was the causative factor creating the slide.[1] Weather records indicate there was only .73 inches of rain between March 20th and May 21st of the same year. During the year 1961, the year in question, rain could not have been a causative factor in that there was only 8.12 inches of rain at this point for the entire year, and from April 1st through September 30th, there was less than 2 inches of rain. The Court takes judicial notice of the fact that the canal system is in an extremely arid region of the state of Oregon. Of course, an annual rainfall of less than 9 inches would indicate that the natural precipitation could not have substantially contributed to the slide.

Throughout the trial, and in the briefs, the slide area was generally referred to as located at railroad milepost 37.60. However, this is the exact location of the culvert under the track at the extreme east end of the exact slide area. The center of the slide was approximately 102 feet west of the culvert. The track relocation, due to the slide, covered a distance of approximately 1,000 feet.

Bolstering a finding that leakage from the canal was the cause of the slide, is the fact that the railroad had no serious problems from the time of the construction in 1911–1912 until after the construction of the canal in 1929. The record is clear that there has been con-

* The date of construction of the canal is also shown as 1931.

1. Within a few days after water was introduced in the canal on March 20, 1965, the flow at a test drain pipe on the side of the hill began to increase in direct proportion to the increase of water in the defendant's canal until May 22nd, when the flow in the canal reached a peak of approximately 600-second feet, at which time the water at the drain pipe was flowing at a rate of approximately 4 gallons per minute, which was eight times more than the flow in January when there was no water in the canal, and the water through the culvert under plaintiff's tracks was flowing at a rate of over 20 gallons per minute or an increase of 20 times over the January, 1965, flow.

stant trouble with slides since the canal was constructed. In 1931 and 1932, there were repeated serious failures in the canal bank, together with definite signs of settlement in the bed of the canal. In the annual report of the Vale Project in 1933 is contained language that definitely points to the very problem with which we are faced.[2] In 1935, it became necessary for the railroad to issue an order permanently slowing down trains passing this point to a speed not in excess of 10 miles per hour due to a "soft spot" in the right-of-way at the point in question. This "slow order" has been in continuous effect since that time. In 1960, the condition became so serious that the railroad track began to move out of alignment, both vertically and horizontally, and throughout the entire 1960 irrigation season, the section crews and the roadmasters had to spend most of their time in maintaining the track at this point so that the trains would be able to move. A large amount of cement was used by defendant in grouting spots in the lining of the canal after the end of the 1960 season, but as soon as water was introduced in the spring of 1961, the problem again presented itself. Beginning in May, 1961, the earth at the toe of the slope began to heave out and away from the slope and to move up under the track forcing the track both up and out toward the river. This required an alignment of the track on several occasions until by the end of June it was impossible to maintain the track at its original location.

The relocation of approximately 585 feet of track in June, 1961, temporarily solved the problem. However, the sliding continued until muck and other debris at the toe of the slope had moved the relocated track some 22 feet so that late in August of the same year, the track was again displaced laterally and vertically. Throughout August, September and October, constant work was necessary in leveling the track so that the trains could pass. Finally, by shifting a total of 870 feet of track toward the river so that the outside extreme of the curve was approximately 50 feet from its original location, the problem was partially solved. This work was done in November and December, 1961. The track now remains in the same location and is usable. Of great significance, on the causative factor, is the fact that the heaving and shifting of the track was only during the summer and fall while the water was in the canal.

A total of six witnesses expressed an opinion as to the cause of the sliding of the track. Each expert testified that water leaking from the canal would cause the slide. An apt description of causes for such a slide was given by Mr. Eggleston in his report.[3] Four witnesses, Mr. Eggleston, Mr. Anderson, Mr. Robinson and Mr. Wright agreed that landslides on a natural slope were caused by: (1) an increase in the load on the slope at some point above the toe; (2) a cut at the base of the slope which removes part of the support; and (3) the addition of water to the slope. It seems apparent that the landslide area under investigation suffered from an increase in load at the top due to the construction of the canal and the placing of a tremendous water load in the canal itself. The witnesses generally agreed that the weight of the water in the canal section adds an appreciable new load to the slope itself, while one witness estimated that the 1,100 feet of canal lined in 1932 and the addi-

2. "The toe of the embankment near the railroad sluffed off and caused the railroad grade to move about 6 feet out of alignment and into the river below. * * * The leak did not exceed 5 inches at any time; it was apparent that a pressure was built up within the embankment that was causing the sliding."

3. "A slide will occur on any natural slope when the forces tending to cause move-ment are greater than the forces which tend to resist movement. * * *
"The force which tends to cause movement in an active slide is the weight of the material above the bottom boundary of the slide (the slip surface). The forces tending to resist movement are friction forces between the soil particles on either side of the slip surface and the cohesion between these same particles."

tional 350 feet lined in 1933, would carry a total weight of water, when the canal was full, of approximately 7,000 tons. Even the use of the roadway along the canal by heavy machinery created an additional weight hazard and added to the instability of the earth below.

■ Although one of defendant's principal contentions is that the action of plaintiff in making a cut on the toe of the hill for its original line contributed to and may have completely caused the problem which now exists, I have carefully reviewed the testimony on this subject and I am forced to a finding that the cut originally made in 1911 or 1912 was of very little, if any, significance for the following reasons: (1) I am convinced that the cut to which the defendant points is not located at the place of the major slide; and (2) that the excess water seeping into the earth on the hillside was the causative factor of the instability of the soil and resulting landslides, rather than any cut made by the railroad some 50 years before the shifting and damage in question.

The emphasis placed on the 1960 cleaning of the drainage ditch is entirely unwarranted. The cleaning operation actually took place, as shown by the record, in 1960, rather than 1961 as claimed by defendant. I find that such cleaning operation had nothing whatsoever to do with the slides and the damage in question.

■ All the experts agreed, and I find, that water within the soil on a hillside does considerably increase in weight and with respect to the forces resisting a slide, water pressure on the slip surface tends to separate the soil particles, thereby reducing the friction. Cohesion, is likewise reduced by a higher water content. One of the charts in evidence would indicate that leakage from the canal added between 10 and 15 thousand gallons of water per day to the hillside during the months of irrigation in May, June and July. One of the best explanations for the probable cause of the landslide is given by the expert, Mr. Anderson.[4] In the final analysis, all of the experts agree in this conclusion.

To be recognized, is the fact that Mr. Wright, a witness for defendant, was of the belief that the addition of water to the particular slope would not necessarily make the slope unstable if the water so introduced from canal leakage during the summer did no more than replace the water which would be introduced into the hillside during the winter-spring from rainfall. This testimony is of no value. His premise that the leakage from the canal during the summer months, did not exceed the volume of rainfall in the winter-spring is not supported by the record. The overwhelming weight of the credible testimony indicates that the canal leakage during the summer was many times greater in volume than that produced by the rainfall in the indicated seasons. The witness' report concedes that the canal does contribute water to the area in the form of leakage and that leakage increases as the head of water in the canal is increased.

### LAW OF THE CASE

It is my considered judgment that the liability of the defendant has been established on three distinct theories.

### STRICT LIABILITY

■ It is my belief that this is a proper case for the application of the doctrine of strict liability. While the majority of the courts in the United States would not apply the doctrine on the facts as I have found them, there can be no doubt that the Oregon courts take the opposite view. The quotation in the footnote [5]

4. "It would appear from the field investigation that the probable cause of the landslide activity in this immediate vicinity has been the contruction and operation of the Irrigation District's canal. * * *"

5. "This case establishes the rule in this state that a person who by artificial means causes water to percolate through the soil to the injury of his neighbor does so at his peril and is legally responsible therefor irrespective of negligence. * * *"

258

from Mallett v. Taylor, 78 Or. 208, 211, 152 P. 873 (1915), making reference to Esson v. Wattier, 25 Or. 7, 34 P. 756 (1893), demonstrates that Oregon has followed the minority rule from an early date. The Honorable James Alger Fee in his classical discussion of the subject in Ure v. United States, 93 F.Supp. 779 (D.Or.1950), leaves no doubt as to the position of the Oregon courts. Judge Fee's opinion is cited with wholehearted approval by the Oregon court in Brown, Adm'x. v. Gessler, 191 Or. 503, 512, 230 P.2d 541, 23 A.L.R.2d 815 (1951). While it is true that the escaping water in *Brown* was over the surface, rather than by percolation, that distinction is, in my opinion, of no significance. The fact that the Oregon court did not apply the doctrine on the factual background in *Brown* is quite understandable. The court there emphasized that the waters collected were not there to serve any purpose of the defendants and were perhaps as unwelcome to the defendants as they were to the plaintiffs. Of course, the water collected in our case was a deliberate impounding by the defendant. The fact that the *Ure* case was reversed on appeal on other grounds is of no importance. Judge Fee's opinion on our problem has not been eroded by the reversal, nor by the passage of time. The doctrine approved by the Oregon courts, and originally stated in Rylands v. Fletcher, 1 E.R.C. 236, L.R., 3 H.L. 330, was most recently approved by the Oregon court in Bedell v. Goulter, 199 Or. 344, 261 P.2d 842 (1953).

Defendant confuses the facts in this case with those involved in such cases as Schweiger v. Solbeck, 191 Or. 454, 230 P.2d 195, 29 A.L.R.2d 435 (1951) and Allen v. K. P. Timber Co., 152 Or. 176, 53 P.2d 29 (1935), where there was no room for the application of the doctrine.

## TRESPASS

 Related to the doctrine of strict liability is a theory of trespass, where liability is imposed on an actor, either by the agency of some force which he voluntarily sets in motion, or personally, trespasses upon the land of another. Any such interference with lawful possession is an act which will entitle the injured party to complain in tort. This is true even though the act may be done accidentally, or in good faith, or under justifiable error. The relationship between the doctrines is ably stated by Judge Fee in *Ure*. He opined that the act of release of a column of water flowing at a fast rate and in great volume places liability on the person who initiates and carries on the activity, and if a trespass results on the lands of another, the liability becomes absolute. That the act of placing of water on the lands of another, as a result of an act voluntarily done constitutes trespass is well settled by Oregon law. Laurance v. Tucker, 160 Or. 474, 85 P.2d 374 (1939); Boulevard Drainage System v. Gordon, 91 Or. 240, 177 P. 956, 178 P. 796 (1919); Stephens v. City of Eugene, 90 Or. 167, 175 P. 855 (1918); Esson v. Wattier, supra. Liability on the theory of trespass is clear.

## NEGLIGENCE

 Originally, I had some difficulty in trying to apply the principles of negligence to the facts as I find them. However, the record requires a finding that the canal and the transportation of huge quantities of water were entirely within the control of the defendant, thus calling into play the doctrine of *res ipsa loquitur*. Aside from that, the defendant had the exclusive management and control of a highly dangerous instrumentality. A very high degree of danger demands a very high degree of care. Suko v. Northwestern Ice & Cold Storage Co., 166 Or. 557, 113 P.2d 209 (1941); Sullivan v. Mountain States Power Co., 139 Or. 282, 9 P.2d 1038 (1932); Ure v. United States, supra, 93 F.Supp. 791–792. The doctrine of *res ipsa loquitur* placed on the defendant the burden of going forward with the evidence to prove that the loss was not caused by the defendant's negligence. I am convinced that defendant, by the exercise of due care, in operating this highly dangerous instrumentality, can, and should, seal the leaks

which are the source of water which saturates the hillside and initiates the earth movement which damages plaintiff's tracks, or should construct drain ditches or install drain pipe of such utility and capacity as to drain away from plaintiff's right-of-way the excess waters defendant has permitted to leak and percolate into the hillside. Kaylor v. Recla, 160 Or. 254, 84 P.2d 495 (1938); Suko v. Northwestern Ice & Cold Storage Co., supra, and Martin v. Reynolds Metals Co., 135 F.Supp. 379 (D.Or.1952), support a recovery by the plaintiff on the theory of negligence.

Throughout the proceeding, the defendant has insisted that plaintiff's recovery for damage by seepage can only be based on negligence. I do not read into Taylor v. Farmers' Irrigation Co., 82 Or. 701, 162 P. 973 (1917) and Patterson v. Horsefly Irrigation Dist., 157 Or. 1, 69 P.2d 282, 70 P.2d 36 (1937), the theories which counsel advance. True enough, seepage from a ditch was involved in those two cases. In *Patterson*, plaintiff's only theory of recovery was negligence. Of particular significance in both *Patterson* and *Taylor* is that in each of those cases the irrigation canal was located on the plaintiff's lands, the rights-of-way having been acquired by the defendants for the purpose of constructing the canal. Consequently, the plaintiff, or his predecessor in interest, in each case, had granted certain rights-of-way to the defendant and could not recover on a theory of negligence for the escape of such water as might have been anticipated by reason of the necessary, natural and ordinary use of the ditches for which the right had been granted. The court went on to say that the plaintiff, or his predecessor, had once been compensated for the seepage and that the plaintiff had no right to be compensated twice for the same damage. The distinction is made apparent in Mallett v. Taylor, supra.[6] The decisions in *Patterson* and *Taylor* are of no help to the defendant.

The fact that the defendant experienced no difficulty in installing drainage facilities on the slope of the hill so as to intercept the escaping water from the canal and convey it to the bottom of the slope, after the damage was done in the fall of 1961, indicates, that similar action might have been taken by a reasonable, prudent person long prior to that date. In Mallett v. Taylor, supra, the court found the defendant negligent for failing to construct waste ditches to prevent seepage and percolation into adjoining property and the same finding was made in Kaylor v. Recla, supra. The installation of proper drainage facilities was required of any prudent operator of a highly dangerous facility, such as the one here under scrutiny.

On the entire record, I find:

 (1) That defendant caused and permitted large quantities of water to escape from its canal on the hillside above the railroad track between mileposts 37 and 38 on the Oregon Eastern Branch and to feed, percolate and flow through and over the soil and down the hillside toward the railroad track and as a result the soil of the hillside and soil adjacent thereto and underneath the track became soft and unstable and the soil of said slope has been thus caused to move into, under, around and against the railroad track of the plaintiff. The said action of the soil has caused the earth underneath and around plaintiff's track to be displaced and to heave upward, thus damaging said railroad track and appurtenant facilities and causing repairs and maintenance work in excess of that which would be required in the absence of the conditions so created by defendant.

6. " 'The owner of the land over which the ditch is constructed cannot be required to take the risk of injury to his property from percolation, and, if the ditch cannot be managed so as to prevent injury from this cause, the owner of the ditch must pay for the injury done thereby as part of the compensation to be made for the right of way; and if the injury can be prevented, and is not, the owner of the ditch is liable *as for negligence.*' Farnham on Waters, § 634." (78 Or. at 212, 152 P. at 874.) (Emphasis supplied.)

(2) The sliding and heaving action previously mentioned, and caused by the escape of water from defendant's canal, again occurred on the 20th of August, 1961, and caused plaintiff's track to heave upward. Additionally, the plaintiff's tracks and culverts were damaged and obstructed and said track and appurtenant facilities were rendered unfit for railroad use so that in order to repair the damage and restore and reopen the track for railroad use, plaintiff was required to, and did relocate and construct a new road bed and track for a distance of approximately 585 feet, and to replace and extend said culverts to plaintiff's damage as hereinafter mentioned.

Likewise, even though some of the specifications are repetitious, I find that defendant was negligent in the maintenance and operation of its irrigation canal above the said railroad track between mileposts 37 and 38 on said branch line in the particulars as charged in the pre-trial order, and that such negligence was the proximate cause of the damage sustained by plaintiff as hereinafter mentioned.

Furthermore, the acts and omissions of the defendant have created a continuing condition which has caused substantial damage to plaintiff on numerous occasions, of which the damage which occurred on or about August 20, 1961, is an example. These trespasses have been repeated and continuous and have constituted both a public and a private nuisance.

Defendant places considerable stress on its importance in serving the public. Of course, that fact does not insulate it against liability. It might be mentioned that plaintiff is, likewise, engaged in a service on which the general public depends.

## DAMAGES

### OREGON EASTERN BRANCH

The evidence is clear that plaintiff suffered a substantial amount of damages at or near milepost 37.60 on plaintiff's Oregon Eastern Branch during the summer and fall of 1963. This damage was fully described by at least two witnesses and is shown in many of the photographs which were taken on August 28, 1961.

The plaintiff's own work force provided the labor in connection with the relocation of the track between August and December, 1961. The section crew, whose assigned right-of-way included this segment of track, worked exclusively for almost three months in the slide area. Two other section crews were taken from their regular sections and used in the slide area for lengthy periods of time between August and December, 1961. Substantial units of earth moving equipment and operators and helpers were brought in to assist on the work. Commencing with August 28, 1961, a record was kept of the time expended in the slide area. These records show that the value of labor totaling $15,170.85, the rental of equipment totaling $2,969.30 and the value of material totaling $3,719.15, or a total of $21,859.30, went into the relocation of the track caused by defendant's acts and failures to act.

Plaintiff's records are not directly attacked by the defendant. On the other hand, defendant argues that since the work was accomplished by plaintiff's regular employees, the defendant should not be charged with the value of their time. I do not follow the reasoning of the defendant. Plaintiff should not be penalized for employing a work force sufficient to meet all emergencies, any more than a person astute enough to carry medical and hospital insurance should be prevented from recovering such items from a wrongdoer. I do, however, believe that there is probably a 15% overlapping in both the labor and equipment charges and each of those amounts will be reduced by 15%. Total damages are allowed in the sum of $19,138.27, and the pre-trial order will be amended to conform.

The reasonable cost of restoring the premises, rather than the diminution of its fair market value is the proper measure of damage. Norwood v. Eastern Oregon Land Co., 139 Or. 25, 5 P.2d 1057, 7 P.2d 996 (1932) and Oregon Mutual

Fire Ins. Co. v. Mathis, 215 Or. 218, 334 P.2d 186 (1959).

## CONTRIBUTORY NEGLIGENCE

As previously mentioned, the defendant has consistently claimed that a contributing cause of the sliding action of the earth was the negligence of the plaintiff in cutting the "toe" of the hill. I find no merit in this contention. The hillside was completely stable from the time of the construction of the railroad until immediately after the construction of, and the entry of water into the canal. Defendant's other claim that plaintiff was guilty of contributory negligence by using a "trackscavater" in cleaning the borrow pit at the base of the hill in 1961 is without foundation. The only direct testimony in the record as to the use of a "trackscavater" in this area was by one witness who testified that it took place in 1960, rather than 1961. True enough, plaintiff's counsel, in a question to one of its witnesses, assumed that there was testimony of such use in 1961. The assumption had no basis in the record. The sole, proximate cause of the landslide and disruption of upheaval and displacement of plaintiff's tracks were the actions of defendant as aforesaid.

## FOURTH AND FIFTH CLAIMS
## BROGAN BRANCH

At a point on plaintiff's Brogan Branch between mileposts 3 and 4, the railroad track extends in a general northerly and southerly located direction. On a hillside west of the track is the canal previously mentioned and described. The railroad track existed in said location for many years prior to the construction of the canal. About July 13, 1962, while said canal was carrying a large amount of water, its lower side gave way causing the water to rush down the hillside to plaintiff's track where it damaged the same. This is the same type and volume of water which we were discussing on the other causes. The canal at Station 246, where it broke was unlined, was located on a fairly steep hillside, sloping downward for approximately 200 feet. It was estimated that at the time of the break the water was flowing through the canal at the rate of 184 cubic feet a second. It was six hours after the break before the defendant was aware of what had occurred. There was, at the time, a 60 foot gap in the lower side of the canal. By that time almost 30,000,000 gallons of water had tumbled down the hillside and in all probability another 40,000,000 gallons pounded against the plaintiff's track before the flow ceased on the late night of the following day. Defendant concedes that the canal broke and the water escaped and flooded plaintiff's track at this point on the mentioned date, but denies liability.

Again, defendant contends that the plaintiff must prove negligence.

This huge volume of water damaged plaintiff's railroad track and road bed for a distance of approximately 800 feet. The same general principles of law applied to the first three claims should, in my opinion, govern the question of liability on these claims. For that matter, the escape of this huge column of water presents a classic example for the application of the doctrine of strict liability. Ure v. United States, supra. Likewise, I find that the evidence supports a finding of liability on the theory of trespass under the doctrines taught in the cases previously cited.

On the charge of negligence on these causes, I have more difficulty. There is evidence that a ditch rider was employed to examine the ditch at least twice a day. Up to the time of the break, the ditch rider had not reported anything indicating a weakness or a leakage in the canal. Here, again, the defendant is confronted with the doctrine of *res ipsa loquitur*. In other words, an inference exists that the break occurred as a result of defendant's negligence. Although under normal circumstances, the ditch rider passed over this area twice each day, there is no direct evidence that he patroled the ditch at this point on July 12, 1961, and, if he did patrol the ditch, there is no evidence as to what he observed, if anything. Since the ditch was unlined at the point of

collapse, the defendant was under a duty to exercise an exceptionally high degree of care. It seems to me that the defendant could have produced stronger and more satisfactory evidence on the experience of the ditch rider and his actions on that particular day. I find that defendant failed to overcome the inference of negligence, and that defendant was negligent in a manner proximately causing the damage on plaintiff's Brogan Branch in the following particulars: (1) in attempting to carry a greater volume of water through the canal than the strength and materials of the wall of the canal could contain; (2) in failing to line the canal adequately to prevent the escape of water; (3) in failing to inspect the canal adequately and with sufficient frequency to detect any weakening or leaking condition; and (4) in failing to promptly detect the break and to shut off or divert the water in the canal after the break had occurred so that the water continued to flow from said break for a period of several hours.

## DAMAGES

Approximately five carloads of crushed slag were required to restore the rail bed and shoulders which were washed by the column of water from defendant's canal. Plaintiff's records show that the reasonable value of this slag delivered to the damaged track was $1,415.17. The records also show that the reasonable value of the labor, and reasonable rental of the equipment, used to restore the track, bed and shoulders to the condition they were in before the wash, was $548.37, making a total cost of restoration in the sum of $1,963.54, which I find to be reasonable.

## RELIEF

On the issues of fact outlined in the pre-trial order, I find in favor of the plaintiff and against the defendant.

Plaintiff is entitled to judgment and decree against defendant for the sum of $19,138.27 for its damage sustained on its Oregon Eastern Branch and the further sum of $1,963.54 on account of damage sustained on its Brogan Branch.

Furthermore, defendant shall, on or before April 1, 1967, take such affirmative action in the vicinity of railroad milepost 37.60 Oregon Eastern Branch, as will effectively eliminate the seepage and flow of excessive water into and around the plaintiff's right-of-way, by the installation below the ditch of adequate drainage, pipes, ditches or other hydraulic equipment, or properly seal and/or extend the concrete lining of its canal, or take such other measures as will eliminate the continued trespasses herein found to exist.

The Court shall retain jurisdiction of the cause for such modifications of this portion of the decree as may be indicated after the close of the 1966 irrigation season.

This opinion shall serve as my findings and conclusions. Additional findings may be requested. An appropriate judgment and decree shall be prepared, served and presented by counsel for plaintiff.